Robert L. HAWKINS and Peggy J. Hawkins, Plaintiffs-Appellants-Respondents,

v.

The MALL, INC., Lee F. Sutliffe, Archie W. Eoff, Barbara Eoff, Southern Commercial and Savings Bank, and S & G Lessors, Inc., Defendants-Appellants-Respondents,

and

Max W. Lilley, Trustee, William H. Harrison, Warren H. Wemhoener, Republic Life Insurance Company, Title Insurance Corporation of St. Louis, First National Bank of St. Louis, Missouri, Mid-Continent Investment Company, Sam Dickey, Trustee, R. W. Hawkins, Sandra Ecker, and Pendleton Goodall, Jr., Trustee, Defendants-Respondents.

No. 52688.

Supreme Court of Missouri, Division No. 1.

Sept. 8, 1969.

Joseph S. Levy, Paul Margolis, Jr., Frank B. Reiser, Levy & Craig, Kansas City, for plaintiffs-respondents, Robert L. Hawkins and Peggy J. Hawkins.

Neale, Newman, Bradshaw & Freeman, Flavius B. Freeman, Jerry L. Redfern, Springfield, for defendants-appellants, Archie W. Eoff and Barbara Eoff.

White & Dickey, Sam Dickey, Springfield, for appellants.

Lilley & Cowan, Max W. Lilley, Springfield, for defendant-appellant, The Mall, Inc.

Ziercher, Tzinberg, Human & Michenfelder, Erwin Tzinberg, Clayton, Mann, Walter, Burkhardt, Weathers & Schroff, C. Wallace Walter, Springfield, for defendants-respondents, Max W. Lilley, Trustee, Warren H. Wemhoener, Trustee, Republic National Life Ins. Co., Title Ins. Corp. and First National Bank in St. Louis.

WELBORN, Commissioner.

Plaintiffs Robert L. Hawkins and his wife, Peggy, owned the west 66 feet of Lot 4 of Davis Place in the City of Springfield. They had a 30-room motel on the lot, operated under the name "The Hawks Motor Inn." Defendants Archie Eoff and his wife, Barbara, owned Lots 1 and 2 of Davis Place, on which they had a restaurant and cocktail lounge known as "Archie's Southern Mansion."

In the latter part of 1961, Hawkins and Eoff began talking about a new motel,

restaurant and cocktail lounge on their properties. Hawkins had previously caused Southway, Inc. to be formed, a corporation in which the Hawkinses and their attorney, Wayne Walker, were the shareholders. The name of the corporation was later changed to "The Mall, Inc." Hawkins and Eoff agreed to use that corporation, then inactive, as the vehicle for their proposed enterprise. In February, 1962, the Hawkinses and Eoffs acquired for $60,000 Lot 3 of Davis Place. This lot was between the properties the parties owned in Davis Place. Hawkins and Eoff each contributed $10,000 to the purchase price and signed a mortgage for the $40,000 balance. Title to Lot 3 was taken in The Mall, Inc.

In July, 1962, Hawkins and Eoff signed a handwritten agreement on their enterprise, which stated, in part:

"This 26th day of July, 1962, Archie Eoff and Robert Hawkins hereby agree to combine into a Land Corp. all of Lots 1, 2, 3 of Davis Place and also Turner Property joining on the North. The Land Corp. will take over the Lease of Turner's Property. Robert Hawkins agrees to pay Archie Eoff $75,000.00 on Lots 1 and 2 of Davis Place. Archie Eoff will own 51% and Robert Hawkins 49% of the Common Stock of the Land Corp. * * *.

"Each party hereby agrees to build thru the Land Corp. a Cocktail Lounge, Restaurant and Motel * * *."

A lease to the Turner property was entered into by The Mall, Inc., on July 31, 1962, with the Eoffs and Hawkinses as guarantors. Otherwise the July 26th agreement was not carried out.

According to Eoff, in August, 1962, the parties entered into a new agreement, in writing, but subsequently lost. According to Eoff, the terms of the agreement were that the interests of the parties in Lots 1, 2, 3 and 4 were to be transferred to the corporation, free of encumbrances, and Eoff would receive 51% of the stock and Hawkins 49%.

On October 2, 1962, a meeting of The Mall's board of directors was held in the office of attorney Walker. Walker resigned as director and Eoff was elected to replace him. The minutes of the meeting recited:

"The Chairman further advised that Archie Eoff had purchased 1500 shares of common stock in the corporation and had paid for same by transfer of certain real estate and other assets to the corporation.

"The Chairman advised that Robert L. Hawkins and Peggy J. Hawkins, his wife, had purchased 1500 shares of common stock in the corporation and had paid for same by transfer of certain real estate and other assets to the corporation.

"Upon motion duly made and seconded it was unanimously agreed that the Officers of the Board of Directors should issue the necessary stock certificates and show same issued upon the records of the corporation and that all stock certificates previously issued should be cancelled and placed in the Permanent Stock Record Book reflecting such cancellation.

"It was further decided that the Officers of the Corporation should secure from the said Archie Eoff and Robert L. Hawkins all required deeds of conveyances and other instruments of writing reflecting the transfer of real estate or other assets to the corporation in payment of the stock sold to them."

A shareholders' meeting was held, on the same date, after the directors' meeting, at which resolutions to the same effect were adopted. The stock was not actually issued. No conveyances to The Mall, Inc. occurred at that time. The minutes of the meetings, prepared near the date of the meetings, were not signed until a year later.

In February, 1963, the Hawkinses and Eoffs purchased Lot 5 of Davis Place for $50,000. Each contributed $10,000 of the purchase price and joined in a note secured by a mortgage for the balance.

In March, 1963, a $500,000 loan was negotiated with Farm and Home Savings and Loan Association to finance the construction of a new restaurant and cocktail lounge and a 100-room motel with which The Hawks Motor Inn was to be operated. The note evidencing the debt and the deed of trust securing it were executed by The Mall, Inc., and the Eoffs and Hawkinses, individually. The deed of trust was for Lots 1, 2 and 3, and the west 1/2 of Lot 4. On the latter, the deed of trust was second to a deed of trust held by Systematic Savings and Loan Association, given to secure a $60,000 obligation of the Hawkinses.

The construction project got under way, with Eoff and Hawkins continuing to operate the Southern Mansion and The Hawks Motor Inn, respectively, for their individual accounts. Differences arose over the joint operation and, on March 20, 1963, the Hawkinses presented Eoff with a "Buy or Sell Agreement or 50–50 Basis." It provided that, until May 20, 1963, either party would have the right to buy out the other for $235,000, less existing loans, "or Mr. Eoff may elect to proceed with the Hawkins on a 50–50 basis."

On May 24, 1963, the Eoffs executed a quitclaim deed to The Mall, Inc., for Lots 1 and 2 of Davis Place. The deed recited that it was "for the purpose of changing title only."

Eoff was unable to accept the Hawkinses' offer to sell their interest in the enterprise, but with their disagreement continuing and with the construction cost obviously going to run in excess of the Farm and Home loan, Eoff sought to interest others in the project. Mr. Glenn Peterson, a representative of a company trying to sell furnishings for the new motel, knew of the differences between Hawkins and Eoff and suggested to Eoff that Mr. Lee F. Sutliffe of St. Louis might be interested in the project. Sutliffe had connections with a Lamplighter motel "chain," operating in several cities. Peterson called Sutliffe who expressed interest in the project and asked Eoff to meet him at the Springfield airport on Sunday, July 21, 1963. Eoff did so and Sutliffe flew to Springfield and obtained information which the architect had prepared on the cost of completing the job.

Sutliffe was associated with Dr. A. R. Sofio, a dentist in Omaha, Nebraska, in ownership of the stock of Anlee Investment Company, a Nebraska corporation. After getting data from Eoff, Sutliffe flew to Omaha and discussed the project with Doctor Sofio. On July 31, 1963, Sutliffe, accompanied by Doctor Sofio, returned to Springfield. They were met at the airport by Eoff who took them to The Hawks Motor Inn and introduced them to the Hawkinses. Negotiations began with the Hawkinses. Eoff was present briefly, but not for the greater part of the time. The negotiations resulted in an agreement which Sutliffe put in writing. The agreement was to enter into a formal agreement along the following lines:

"The purchaser, Anlee Investment Company, a Nebraska Corporation, will purchase the property known as The Hawks Motor Inn, 1839 East Sunshine, Springfield, Missouri, together with all of the stock and holdings of The Mall, Inc., a Missouri Corporation owned by Robert L. Hawkins and Peggy J. Hawkins, husband and wife, of Springfield, Missouri, according to the following terms.

"A. Purchase price to be $210,000.00, payable $50,000.00 in cash and the balance as follows:

"(1) Cash on closing $50,000.00;

"(2) Assume First Mortgage $60,000.00 subject to adjustment;

"(3) Note secured by second mortgage and personal endorsement $100,000.00 payable in 25 equal quarterly installments of $4,000.00 each, plus interest at 6% per annum on the unpaid balance.

"B. The note of Robert L. Hawkins and Peggy J. Hawkins in favor of The Mall, Inc. in the principal sum of $40,000.00 is to be forgiven and returned marked 'paid in full.' "

(The $40,000 note of the Hawkinses to The Mall, Inc., was an advance made by the corporation, with Eoff's approval, to Hawkins around June, 1963.)

The document was signed by the Hawkinses and Doctor Sofio signed on behalf of Anlee, "Purchaser," as its president, and Sutliffe as its executive vice-president. Above the execution by Anlee appeared the word "Acknowledged" and below that word the signature "Archie Eoff."

Sutliffe returned to St. Louis. Having had legal training, he prepared a formal contract between Anlee Investment Company and the Hawkinses. The contract called for the sale by the Hawkinses of their interest in Lots 1, 2, 3, 5 and the west 66 feet of Lot 4 of Davis Place, including The Hawks Motor Inn and in the Turner leasehold, together with "the Seller's interest, stock and holding in and to Mall, Inc." The consideration recited was $210,000, payable as follows:

"The purchase price for the property and interests of the Sellers as described above shall be the sum of Two Hundred Ten Thousand ($210,000.00) Dollars payable as follows:

"1. Cash on closing, Fifty Thousand ($50,000.00) Dollars.

"2. Assumption of a first mortgage loan in a principal amount not to exceed Sixty Thousand ($60,000.00) Dollars in favor of Systematic Savings & Loan Association, of Springfield, Missouri.

"3. The note of Mall, Inc., in the principal amount of One Hundred Thousand ($100,000.00) Dollars to be payable in twenty-five (25) equal quarterly install-

ments of Four Thousand ($4,000.00) Dollars each, plus interest at the rate of Six per cent (6%) per annum on the unpaid balance, which note is to be secured by a second deed of trust on Tract 2 described above and further which note is to be personally endorsed and guaranteed by Anthony R. Sofio of Omaha, Nebraska and Lee F. Sutliffe of St. Louis, Missouri, as well as Anlee Investment Company, Inc.

"As a further consideration, the Purchaser agrees to forgive and return to the maker marked 'Paid In Full,' that certain note of the Seller in favor of Mall, Inc., in the principal sum of Forty Thousand ($40,000.00) Dollars, a copy of which note is attached hereto and made a part hereof."

On August 2, Sutliffe returned to Springfield with the formal contract. Eoff met him at the airport and at sometime during the visit he gave Eoff a copy of the proposed contract. Sutliffe was driven by Eoff to the Southern Mansion and then went to The Hawks Motor Inn to discuss the contract with the Hawkinses. The Hawkinses had some suggestions about the document and wanted their attorney, Mr. Walker, to examine it.

On August 7, Sutliffe and Doctor Sofio returned to Springfield where they met the Hawkinses at Walker's office. After Walker had examined the contract it was executed by the parties, with Doctor Sofio as president of Anlee, and attestation of the Anlee execution by Pendleton Goodall, Jr., as assistant secretary. Goodall was Sutliffe's attorney.

On August 8, 1963, an agreement was entered into between Anlee, acting through Sutliffe, and the Eoffs for the transfer of one share of the Eoffs' stock in The Mall, Inc., to Anlee. The agreement referred to the contract between Anlee and the Hawkinses and was contingent upon the completion of that contract. Eoff signed the agreement despite the advice of his attorney that it was "a bad deal" for him.

On August 14, 1963, Republic National Life Insurance Company of Dallas issued to Sutliffe as president of the Mid-Continent Investment Company a commitment for a $1,050,000 "take-out" loan to The Mall, Inc., including The Hawks Motor Inn. The commitment was issued on the understanding that construction financing in an amount not to exceed $840,000 would be arranged.

Sutliffe, with the cooperation of Hawkins and Eoff, compiled information about the debts owed on the motel project and the cost of its completion. He sought a construction loan from the First National Bank in St. Louis. An officer of the bank examined the project and the bank agreed to undertake the construction loan on the condition that the Title Insurance Corporation act as disbursing agent and on the further condition that satisfactory long-term financing can be arranged.

The numerous details of the transaction could not be completed in time for the original August 31 closing date. On August 23, Sutliffe wrote Hawkins suggesting that the closing date be extended to September 10. The Hawkinses agreed to that extension and subsequently the closing date was further extended.

On September 4, Sutliffe was in Springfield, assembling information regarding construction costs. At that time, he employed Escrow Facilities of Springfield to handle the closing. On September 17 and 18, Sutliffe and Doctor Sofio went over the work at the site with a representative of the First National Bank. On that occasion, because the projected construction costs were near the financing anticipated, the August 2 agreement between Anlee and the Hawkinses was amended to call for a $25,000 cash payment to the Hawkinses, instead of $50,000, with a $25,000 note of The Mall, Inc., in addition to the secured $100,000 note called for in the original agreement.

Sutliffe was in Springfield on three other occasions prior to the closing of the transaction which began October 8. On each of his visits to Springfield, Sutliffe was in touch with Eoff and Hawkins.

On October 7, Republic National Life issued its final loan commitment. On October 8, a meeting was purportedly held at Escrow Facilities. According to Sutliffe, he, Goodall, the Eoffs, the Hawkinses and two representatives of Escrow Facilities were present. Sutliffe and Goodall testified concerning what purportedly were meetings of the directors and the stockholders of The Mall, Inc., at that time. The other claimed participants could recall no such meetings. The Eoffs were at the Escrow Facilities office on October 8. Quite likely, minutes were merely signed purporting to record what happened at such meetings without formal meetings actually being held.

The minutes show a purported special meeting of the shareholders of The Mall, Inc. The minutes show that the holders of 3000 shares of The Mall, Inc. stock were present, to-wit:

Archie and Barbara Eoff  1500 shares

Lee F. Sutliffe and A. R. Sofio, representing Anlee Investment Company, Inc.  1500 shares

Actually, no certificates for shares of The Mall, Inc. stock had been issued. As of October 8, 1963, the issuance of 1500 shares to the Eoffs and 1500 shares to the Hawkinses had been authorized, but the certificates had not been issued and there had been no transfer of the Hawkinses' shares to Anlee. The minutes report the resignation of Barbara Eoff and of the Hawkinses as directors and the election of Sutliffe, Sofio and Goodall to succeed them. The minutes were signed by Eoff as secretary of the meeting and were also signed as approved by Eoff, Sutliffe and Sofio.

The minutes show a special meeting of the directors of The Mall, Inc., held at 11:00 A.M., October 8. They show the presence of Sofio, Sutliffe, Goodall and Eoff and the election of officers of The Mall, Inc., as follows:

| | |
|---|---|
| Chairman of the Board | Anthony R. Sofio |
| President | Lee F. Sutliffe |
| Vice-President and Asst. Secretary | Pendleton Goodall, Jr. |
| " " " " | Louis T. Carnazzo |
| " " " Treasurer | Archie Eoff |
| Treasurer | Fred P. Streib |
| Secretary | Mary Ann Danekind |

———◆———

The minutes of the directors' meeting recite the adoption of a resolution authorizing the acceptance by The Mall, Inc., of the commitment received by Mid-Continent Investment Company from Republic National Life Insurance Company for a $1,030,000 15-year loan; the payment to Mid-Continent of a fee of $65,000 for its services in obtaining the loan commitment which amount included the Republic National commitment fee ($35,000); the borrowing of $1,030,000 from Mid-Continent on the terms of the Republic commitment; the execution of a deed of trust covering Lots 1, 2, 3, and 5 and the west 66 feet of Lot 4 of Davis Place and the Turner leasehold.

Another resolution authorized the purchase of The Hawks Motor Inn in accordance with the prior agreement between Anlee and the Hawkinses.

These minutes also bear the signature of Eoff as secretary of the meeting, as well as the signature of the four purported directors, signifying their approval of the minutes.

The minutes show a second meeting of the shareholders of The Mall, Inc., held at 2:30 P.M. on October 8. Waiver of notice of the meeting is signed by the Eoffs and by Sutliffe, as proxy for Anlee. The minutes show the adoption of a resolution approving the resolution of the directors authorizing the $1,030,000 borrowing.

In preparation for the closing of the transaction, the Eoffs and Hawkinses had jointly executed a warranty deed on September 4, 1963, conveying Lots 1, 2, 3, 5 and the west 66 feet of Lot 4 of Davis Place to The Mall, Inc. The deed had been delivered to Escrow Facilities.

On October 8, Sutliffe, purporting to act as president of The Mall, Inc., executed on behalf of that corporation a deed of trust to Goodall as trustee for Mid-Continent Investment Company, covering Lots 1, 2, 3, 5 and the west 66 feet of Lot 4 of Davis Place and the leasehold interest in the Turner property, to secure a $1,030,000 indebtedness. Goodall attested the execution as assistant secretary of The Mall, Inc. For the corporate seal of The Mall, Inc., someone drew a circle around a half-dollar and then drew a circle around a 25-cent coin, concentric with the 50-cent coin circle. Between the two circles "Corporate Seal" and "Missouri" were printed. The Mall, Inc., did have a corporate seal. A device for impressing the seal was in Wayne Walker's possession on October 8 and was brought to the final closing on October 11. Sutliffe also executed on behalf of The Mall, Inc., a $1,030,000 note payable to Mid-Continent.

The warranty deed from the Eoffs and Hawkinses to The Mall, Inc., was filed for record in the Greene County Recorder's office at 4:43 P.M., October 8. The deed of trust from The Mall, Inc., to Mid-Continent was filed for record one minute later.

With these documents recorded, Sutliffe returned to St. Louis. There, before re-

turning to Springfield on October 10, for the final closing, he exhibited the recorded documents to Mr. William H. Harrison, Vice-President of the First National Bank, together with the final loan commitment of Republic. A Construction and Disbursing Escrow Agreement between The Mall, Inc., as owner, The First National Bank in St. Louis as mortgagee, and Title Insurance Corporation of St. Louis as escrowee was executed, Sutliffe signing as president of The Mall, Inc. The agreement was premised on a loan to produce $1,030,000 and called for disbursements as follows:

| | |
|---|---:|
| Interest During Construction | $ 15,000.00 |
| Escrowee Disbursing Fee | 7,847.00 |
| Outstanding Construction & Miscel. Bills | 112,000.00 |
| Farm and Home Loan Payoff | 424,717.32 |
| Systematic Savings and Loan Payoff | 58,559.50 |
| Empire Bank Loan Payoff | 580.00 |
| To acquire interest of Hawkinses Mid-Continent Inv. Co. | 25,000.00 |
| Fees—Legal Services—Loan Comm. | 55,000.00 |
| Title examination | 250.00 |
| Survey | 258.30 |
| Recording | 50.00 |
| Escrow Facilities, Inc. | 7,302.00 |
| For Completing Construction | 243,293.04 |
| Contingency Reserve | 80,142.84 |
| | $1,030,000.00 |

—◆—

After meeting with General Harrison on the morning of October 10, Sutliffe flew to Springfield, accompanied by Goodall, Mary Ann Danekind, Sutliffe's secretary, and John Petersen, who was to represent the Title Insurance Corporation at the closing. Sutliffe hoped to close on the afternoon of October 10 and the persons in his party went to the office of Escrow Facilities for that purpose. The Hawkinses and the Eoffs were also at Escrow Facilities office. However, the Hawkinses' attorney, Walker, was not available, and the closing was postponed until the following day. Some documents were executed by the parties at the Escrow Facilities office, in preparation for delivery at the closing.

Among the documents at the Escrow Facilities office on October 10 was the $100,000 second deed of trust to be given by The Mall to secure the payment to the Hawkinses of that amount as part of the price of their interest. The deed covered the west 66 feet of Lot 4, the tract on which The Hawks Motor Inn was located. Petersen had learned about this deed of trust on the way to Springfield with Sutliffe. He became concerned about the priority of the $1,030,000 deed of trust the First National was to acquire. He discussed the question with Sutliffe and Max Lilley of Escrow Facilities. At Petersen's insistence, the following clause was inserted in the prepared form of the second deed of trust. The clause was typed on the first page of the document, immediately below the description of the property. It read as follows:

"This Second Deed of Trust is subordinate to a first Deed of Trust in favor of Mid-Continent Investment Company bearing recorder's file No. 12664 and subordinate to a Security Agreement dated October 10th, 1963 in favor of Title Insurance Corporation of St. Louis."

Hawkins was at the Escrow Facilities office when the question raised by Petersen

was discussed, but it was not mentioned to Hawkins.

The parties returned to the Escrow Facilities office on October 11 and the closing was completed. Walker produced the minute book and stock register of The Mall, Inc. The minutes of the October, 1962 meeting had not been signed. He had them signed by the Hawkinses and the Eoffs. Stock Certificate No. 1 for 1500 shares in the Hawkinses was prepared. Certificate No. 2 for 1500 shares in the Eoffs was also signed. Both were dated October 2, 1962.

Other closing documents were executed and delivered. The $100,000 note secured by the deed of trust on The Hawks property was delivered to the Hawkinses, as was the $25,000 unsecured note. With various other debits against the total purchase price of $210,000, the net proceeds to the Hawkinses were $23,620.29. Of this sum, $6,000 was held by Escrow Facilities because of pending litigation. The notes given the Hawkinses were guaranteed by Sutliffe and Sofio personally, and by Anlee Investment Company. The $40,000 note of Hawkins to The Mall, Inc. was not available at the closing, but it was eventually marked "Paid in Full" by Sutliffe, acting as president of The Mall, Inc.

The security agreement between The Mall, Inc. and the Title Insurance Company was executed and recorded. The Systematic Savings and Loan Association loan was paid. The Farm and Home loan was paid and the deed of trust securing it released. The assignment to the First National Bank of the $1,030,000 note of The Mall to Mid-Continent was completed. Mid-Continent executed a $1,030,000 note to the First National as added security for The Mall loan.

In addition to the disbursements to Hawkins and payment of the Farm and Home and Systematic loans, Petersen paid, from the escrow account, the $55,000 to Mid-Continent Investment Company and approximately $95,000 on outstanding construction bills.

Construction proceeded under the escrow arrangement. The stock ledger of The Mall, Inc. shows that, on October 23, 1963, the 1500 shares previously issued to the Hawkinses were reissued as follows: Anthony R. Sofio and wife, 675 shares; Lee F. Sutliffe and wife, 675 shares; Louis T. Carnazzo and wife, 150 shares.

Sutliffe had a line of credit at the Southern Commercial and Savings Bank of St. Louis. Sutliffe had an arrangement with the bank whereby he pledged his interest in various enterprises as security for loans either to him personally or for which he was guarantor. Pursuant to such arrangement, on November 8, 1963, he deposited his certificate for 675 shares of The Mall, Inc., with the Southern Commercial and Savings Bank, thereby beginning that bank's involvement in the affairs of The Mall, Inc.

Those affairs were not proceeding smoothly. In November, The Mall, Inc. defaulted in the payment of rent on the Turner lease. The $100,000 note given Hawkins called for a $4,000 principal payment on December 15, 1963, which was not made. On January 27, 1964, this litigation began as a suit on the note by the Hawkinses against The Mall, Inc., Sutliffe, Doctor Sofio and Anlee Investment Company.

On February 13, 1964, the board of directors of The Mall met in Springfield. Sutliffe was present. An attorney, Mr. Polack, was present, representing Doctor Sofio. An election of officers was held. Mr. Sutliffe nominated himself as president. When no one seconded his nomination, Sutliffe said: "You guys have got this all set up, come on up to St. Louis and pick up your files and everything else." Sutliffe thereupon left the meeting and terminated his connection with The Mall, Inc. Eoff was elected president, Polack vice-president and Sofio secretary and treasurer.

On February 2, 1964, The Mall, Inc. borrowed $32,000 from the Republic National Life Insurance Company, secured by a deed of trust on Lot 5 of Davis Place. The

proceeds of the loan were used to pay off the Systematic Savings and Loan Association which had begun to foreclose the deed of trust given by Hawkins and Eoff when they jointly purchased Lot 5 in 1963.

The construction work proceeded after the Hawkinses' suit was filed. The escrow agent continued to make payments under the escrow agreement. The escrow agreement set a February 1, 1964 date for completion of the improvement, but that date obviously was not met. A tentative date for opening the new facilities as late as July 15, 1964 likewise was not met.

In May, 1964, the Southern Commercial and Savings Bank took over the 675 shares of Mall stock pledged to it by Sutliffe. In June, The Mall began borrowing from that bank. On June 18, 1964, a special meeting of Mall stockholders was held in Kansas City. Doctor Sofio had previously refused to come into Missouri (he was never served in this litigation), but he did consent to a meeting in Kansas City at which his stock was voted by his proxy, Polack. At that meeting, the 150 shares previously issued to Carnazzo were declared to have been issued without consideration and were ordered divided equally between Sofio and Southern Commercial. Two vacancies on the board of directors, one occasioned by the resignation of Sutliffe, were filled by the election of Byron Moser, Jr., who held the bank proxy, and Robert W. Hawkins (not to be confused with plaintiff Robert L. Hawkins), the bank's president.

Immediately following the stockholders' meeting, a meeting of The Mall directors was held, at which a resolution was adopted authorizing a change in the authorized capital of the corporation from 3,000 shares of $100 par value stock to 6,000 shares of no par, to be issued for not less than $1.00 per share. The additional 3,000 shares were to be divided equally, between Eoff and the bank, the former to receive his shares in return for "money advanced by Archie Eoff to keep the Corporation in operation during the past several months

in the sum of approximately $8,200 * *." The shares to the bank were issued for the purchase of an obligation of The Mall to Mid-Continent of $7,200, and a Lamplighter franchise. Hawkins had procured the latter from Sutliffe. Certificates for these shares were issued, but the amendment to the articles of incorporation was never completed. The directors also authorized the borrowing of up to $100,000 to provide operating capital for the motel operation. A meeting of the stockholders, immediately following the directors' meeting, ratified the action of the directors.

On June 29, 1964, The Mall, Inc., by Eoff as president, executed a note for $100,000, payable to Sandra Ecker, an employee of Southern Commercial, secured by a deed of trust on Lots 1, 2, 3 and 5 and the west 66 feet of Lot 4 of Davis Place and the Turner leasehold. No money was actually received by The Mall, Inc., from Ecker, but the note and deed of trust were pledged with the Southern Commercial as collateral for past and future loans to The Mall, Inc. In July and August, The Mall borrowed $35,000, on the security of the pledged deed of trust. In August, Eoff purchased a 1/7 participation in the indebtedness to the bank, with his stock as collateral.

On August 21, 1964, Southern Commercial demanded payment of its indebtedness from The Mall, Inc. Foreclosure of the Ecker deed of trust began. Sale under the deed of trust was held in Springfield on September 23, 1964. S & G Lessors, Inc. was the purchaser at the trustee's sale, for $1,000, and a trustee's deed for Lots 1, 2, 3, 5 and the west 66 feet of Lot 4 of Davis Place and the leasehold interest in the Turner property was delivered and recorded.

S & G Lessors, Inc. is a subsidiary of Southern Commercial. It was organized to purchase furnishings for the Lamplighter Motel.

The original petition of Robert L. and Peggy J. Hawkins, filed in January, 1964, sought only judgment against The Mall,

Inc., Sutliffe, Sofio and Anlee Investment Company, Inc., on the $100,000 note. No service was had on Sofio or Anlee. The defendants, The Mall, Inc. and Sutliffe, filed answers, alleging that the note was without consideration because given in payment of The Hawks Motor Inn property which had previously been sold to The Mall, Inc. The answers also charged that the payments made under the contract reduced the stated capital of The Mall, Inc., in violation of the laws of Missouri. The Mall, Inc. claimed against plaintiffs and cross-claimed against Sutliffe and Sofio. It alleged that Sutliffe, Sofio and plaintiffs had conspired to defraud The Mall, Inc. Rescission of the transaction and judgment for $65,000 damages were asked.

On August 10, 1964, plaintiffs filed their first amended petition in three counts. Added as parties defendant were Archie Eoff and his wife, Barbara, James and Mary Turner, owners of the leased tract, First National Bank in St. Louis, William H. Harrison, a vice-president of that bank, Title Insurance Corporation of St. Louis, Warren H. Wemhoener, vice-president of Title Insurance Corporation, Southern Commercial and Savings Bank, Robert W. Hawkins, president of that bank, Mid-Continent Investment Company, Pendleton Goodall, Jr., trustee under the $1,030,000 deed of trust, Sam Dickey, trustee of the $100,000 deed of trust to Sandra Ecker, Sandra Ecker, Max Lilley, trustee for Republic National Life Insurance Company on its $32,000 deed of trust, Republic National Life Insurance Company. During the trial, S & G Lessors, Inc. was added as a party to Count III.

Count I of the petition alleged that the transactions outlined above were in the perpetration of a fraudulent scheme to deprive plaintiffs of their interest in the Davis Place property and the leasehold without paying plaintiffs its value. It sought to cancel the September, 1963 deed of plaintiffs to The Mall, Inc., the voiding of deeds of trust executed by The Mall, Inc., on and subsequent to October 8, 1963, and the cancellation of shares of stock of The Mall, Inc., issued in the transaction and their return to plaintiffs. Count II of the petition sought $300,000 punitive damages for the fraudulent scheme to defraud. Count III sought a declaration that plaintiffs' $100,000 deed of trust was a prior lien on the west half of Lot 4 of Davis Place (The Hawks Motor Inn).

A counterclaim and cross-claim were filed by the Turners. All controversies involving them have been settled and we note the litigation no further, insofar as it related to the leasehold interest.

All defendants (except Sofio and Anlee) filed answers denying plaintiffs' allegations of fraud and conspiracy. In addition, The Mall, Inc. counterclaimed against plaintiffs and cross-claimed against Sutliffe and Sofio, alleging that the transaction between plaintiffs and such defendants was part of a scheme to defraud The Mall of its assets without consideration. Judgment of $100,000 was sought. The Eoffs counterclaimed against plaintiffs and cross-claimed against Sutliffe, alleging that those parties had deprived them of their property and business by false representation. Actual damages of $250,000 and punitive damages in the same amount were sought.

At the conclusion of a lengthy trial, the trial court made findings of fact and conclusions of law. Judgments were entered as follows:

Count I of plaintiffs' amended petition— Against plaintiffs and in favor of defendants.

Count II of plaintiffs' amended petition— Judgment for plaintiffs and against The Mall, Inc. for $100,000 principal, $17,500 interest and $25,000 attorneys' fees. Plaintiffs' deed of trust on the west 66 feet of Lot 4 of Davis Place was adjudged valid, subordinate only to the deed of trust securing the $1,030,000 obligation of The Mall, Inc. Foreclosure of the equity of redemption in that trust was adjudged. The rights, title and interest of the parties in the land in question were also adjudicated.

Judgment for plaintiffs and against defendant The Mall, Inc. on latter's counterclaim.

Judgment for plaintiffs and against Eoffs on their counterclaim.

Judgment for The Mall, Inc. and against defendant Sutliffe for $97,500 on cross-claim.

Judgment for Eoff and against defendant Sutliffe for $200,000 actual and $50,000 punitive damages on cross-claim.

Notices of appeal were filed by plaintiffs Robert L. and Peggy J. Hawkins, The Mall, Inc., Archie and Barbara Eoff, Southern Commercial and Savings Bank, S & G Lessors, Inc. and Lee F. Sutliffe. No brief has been filed in this court on behalf of Sutliffe and his appeal is considered abandoned. As respondents on the appeals of Eoffs and of The Mall, Inc., the Hawkinses have moved to dismiss the appeals of those parties for failures of their briefs to comply with the rules of this court. Those motions are overruled.

Consequently, there are now before the court for disposition:

1. The appeal of the Hawkinses, limited here to the contention that the deed of trust securing their $100,000 note should be declared a superior lien to that of the deed of trust securing the $1,030,000 loan and of the security agreement between The Mall, Inc. and Title Insurance Corporation.

2. The appeal of The Mall, Inc. from the judgment in favor of the Hawkinses against it and from the judgment against The Mall, Inc. and in favor of the Hawkinses on the counterclaim of The Mall, Inc.

3. The appeal of Archie W. and Barbara Eoff from the judgment against them and in favor of the Hawkinses on Eoffs' counterclaim.

4. The appeal of Southern Commercial and Savings Bank and S & G Lessors, Inc. insofar as the judgment in favor of plaintiffs on Count III of their amended petition affects the claim of the bank and Lessors.

We consider first the questions raised on the appeal of plaintiffs Hawkins. They attack the validity of the $1,030,000 deed of trust on two grounds: First, that it does not bear a true seal of The Mall, Inc. and, therefore, was not entitled to be recorded. Second, that the persons purporting to execute the deed of trust as officers of The Mall, Inc. were not authorized to act for that corporation.

The corporate seal appearing on the deed of trust is a handdrawn device. The Mall, Inc., on October 8, 1963, did have a corporate seal, with a device for reproducing it, in the custody of attorney Walker. The official seal was used at the final closing, but was not affixed to the deed of trust. The appellants Hawkins .point to § 442.060, RSMo 1959, V.A.M.S., reading in part as follows:

"Any corporation, private or public, or otherwise organized, authorized to hold real estate, may convey the same by deed, *sealed with the common seal of such corporations,* and signed by the president or presiding member or trustee thereof; * * *."

The importance of affixing corporate seals to documents evidencing corporate action has changed considerably since the decision in Perry & Ruggles v. Price, 1 Mo. 645, motion for rehearing, 664, cited by appellants. There the failure of Bank of St. Louis to adopt a corporate seal resulted in the voiding of a deed signed by the president of the bank "with a plaster of wax affixed at the end of his signature." 1 Mo. 648. Stating that this wax could not be the seal of the corporation, the court said: "It (the seal) is and can be nothing else than the instrument used to make an impression on the tenacious substance attached to deeds, executed by the corporation, and when in common parlance we say a deed has affixed to it the seal of the corporation, we mean nothing more than the

impression of that seal on the wax." 1 Mo. 650.

■ Subsequent legislation, the history of which is traced in Pullis, et al. v. Pullis Brothers Iron Company, et al., 157 Mo. 565, 582–587, 57 S.W. 1095, authorized conveyance by a corporation having no seal. The 1943 General and Business Corporation Act authorized the use of a facsimile seal. Laws of 1943, p. 410, § 4. See § 351.385(3), RSMo 1959, V.A.M.S. The legislative action is sufficient basis for the acceptance and application of what Fletcher calls the "prevailing doctrine that a corporation may adopt a seal for a particular transaction, even though it have a common seal. For even where a corporation possesses a common seal, it is not restricted to the use of such seal. It may adopt, pro hac vice, for the particular transaction, any other seal than its own, or any device bearing semblance to a seal, and to authorize use of such a seal, formal action by the board of directors is not necessary." 6 Fletcher on Corporations (1968 Rev.), § 2463, pp. 242–243.

Appellants' second attack on the $1,030,-000 deed of trust is on the grounds that the persons who executed the instrument had no authority to do so. The deed of trust was executed on behalf of The Mall, Inc. by Sutliffe as president and attested by Goodall as assistant secretary. The instrument is dated and was filed for record, October 8, 1963. Authority for its execution was a purported meeting of The Mall stockholders, held at 10:00 A. M., October 8, 1963, attended by the Eoffs as holders of 1500 shares and Sutliffe and Sofio as representatives of Anlee as holder of 1500 shares, and at which Sutliffe, Sofio and Goodall were elected directors to replace the Hawkinses and Mrs. Eoff; a purported meeting of the board of directors held at 11:00 A. M., October 8, 1963, attended by Eoff and the three newly elected directors, at which Sutliffe was elected president and Goodall, vice-president and assistant secretary, and at which a resolution was adopted, authorizing the borrow-

ing of $1,030,000 from Mid-Continent Investment Company according to the terms of the final Republic National Life Insurance Company loan commitment and the execution of a deed of trust on The Mall's property to secure such indebtedness; a purported meeting of Mall stockholders, attended by the Eoffs and Sutliffe as proxy for Anlee, purportedly held at 2:30 P.M. October 8, 1963, at which the action of the board of directors was ratified.

The trial court found that these meeting were not actually held. We agree with that finding. Furthermore, Anlee was not, in fact, a Mall stockholder on October 8, 1963. In prospect, of course, was the transfer of the Hawkins stock, but such transfer did not actually occur until the final closing on October 11. Anlee would not, therefore, have been entitled to representation at the October 8th meeting, even if it had been held. Assuming the issuance of 3,000 shares of Mall stock, the Eoffs would have been the only actual stockholders present. Their 1500 shares would not have constituted a quorum (§ 351.265, RSMo 1959, V.A.M.S.) and the purported meeting even if held would not have properly elected the directors who undertook the further action to elect officers and to authorize the loan and deed of trust.

The appellants assert that all of these purported meetings provided no authority for the action taken and for the representation of The Mall by Sutliffe and Goodall in the execution of the deed of trust. Appellants contend that the situation is the same as that presented in Grafeman Dairy Co. v. Northwestern Bank, 290 Mo. 311, 235 S.W. 435, in which a deed of trust executed by corporate officials without authority was held invalid. There are, however, distinctions between that case and the present. Primarily, in the Dairy Co. case, the loan, purportedly for the benefit of the corporation, was actually for the personal benefit of the official executing the deed of trust. The bank which took the deed of trust had reason to be-

lieve when it did so that the deed had been executed without authority. The bank demanded evidence that the directors and stockholders had authorized the borrowing and the execution of the deed of trust and continued its lending although such evidence was not provided. Here, there can be no doubt that the proceeds of the loan were used for the benefit of The Mall, Inc., the borrower. Although Sutliffe benefited indirectly from the loan, so did the Hawkinses. It provided the source of the $25,000 cash they received and it also provided the funds for the payment of their personal obligation to Systematic Savings and Loan. The First National Bank was presented with evidence of the authority of the officers of The Mall. This evidence was in the form of Goodall's affidavit, verifying a copy of the minutes of the October 8th second stockholders' meeting ratifying the action of the board of directors authorizing the loan and deed of trust.

If, as between the First National and the Hawkinses, there was knowledge or reason to know the actual status of Sutliffe, that knowledge must be attributed to the Hawkinses, not to the bank. As early as September 5, 1963, the Hawkinses had entered into an Indemnity and Pledge Agreement with The Mall, Inc., with Sutliffe signing the document on behalf of The Mall. Among the closing documents was the Construction and Disbursing Escrow Agreement, dated October 9, and executed by Sutliffe as president of The Mall. Another closing document was a consent by the lessors to the mortgaging of the leasehold interest of The Mall. This was executed on behalf of The Mall by Sutliffe and was consented to by the Hawkinses as guarantors of the lease. Hawkins was, according to the minutes of The Mall, the president of the corporation at the time of the closing of the transaction. He must have known that he had not acted in his official capacity on behalf of the corporation on any of the closing papers. He must have known that someone was so act-

ing. Yet, he made no objection and permitted the transaction to be completed and accepted its benefits.

■ Another important distinction is that in Grafeman the objection of lack of authority was raised by the corporation on behalf of which the officer purported to act. Here, The Mall is making no objection to Sutliffe's undertaking to act on its behalf. The Hawkinses are making the attack as creditors. "Neither the receiver of a corporation nor its creditors can set up want of authority on the part of an officer to borrow money for the corporation, for the purpose of attacking the security given therefor, where the creditors and the corporation have received the benefit of the transaction." 2 Fletcher on Corporations (1969 Rev.) § 491, p. 507. Here, as above pointed out, the corporation did receive the benefit of the First National loan. Hawkins, the attacking creditor, also received the benefit of such loan. He cannot be heard to complain of lack of authority of the persons who acted on behalf of the corporation.

■ The Hawkinses attack the trial court's decree insofar as it failed to declare that their $100,000 deed of trust was a first lien on The Hawks property, superior to the First National deed of trust and the Title Insurance Corporation security agreement. The contention of Hawkins is that, by his agreement with Anlee, he was to receive back a second deed of trust on The Hawks to secure the $100,000, but that the understanding was that such deed of trust would be second only to the existing $60,000 held by Systematic Savings and Loan and that when that obligation was paid, he was entitled to a first lien on the property.

The agreement between Hawkins and Anlee provided that part of the purchase price of the Hawkins interest should be paid as follows:

"The note of Mall, Inc., in the principal amount of One Hundred Thousand

($100,000.00) Dollars to be payable in twenty-five (25) equal quarterly installments of Four Thousand ($4,000.00) Dollars each, plus interest at the rate of Six per cent (6%) per annum on the unpaid balance, which note is to be secured by a second deed of trust on Tract 2 described above and further which note is to be personally endorsed and guaranteed by Anthony R. Sofio of Omaha, Nebraska and Lee F. Sutliffe of St. Louis, Missouri, as well as Anlee Investment Company, Inc."

Hawkins theorizes an elaborate conspiracy to defraud him of what he claims he was entitled to receive under this provision. He begins with Eoff's bringing Sutliffe into the picture to buy out the Hawkinses' interest in the motel project. He assumes that the scheme was sinister from the beginning because Eoff conferred with Sutliffe whenever the latter came to Springfield. He charges, without evidentiary support, the secret selection by Eoff and Sutliffe of The Mall as their nominee under the purchase contract. He charges that Eoff and Sutliffe agreed to keep the agreement by the former to sell Anlee one share of his stock secret from Hawkins. The references in the transcript claimed to support this charge fail to do so. He charges that the October 8th meeting of Sutliffe and Eoff at the office of Escrow Facilities was without his knowledge, at which time the warranty deed to The Mall which Hawkins and his wife had executed and delivered in escrow to Escrow Facilities with instructions that it be held to the date of closing was, contrary to such instructions, released and placed of record, along with the $1,030,000 deed of trust from The Mall to Mid-Continent. Max Lilley of Escrow Facilities testified that there were no specific instructions on the release of the deed. Hawkins attacks the execution of the deed of trust by Sutliffe and Goodall, without authority to act on behalf of The Mall, with a crudely hand-drawn seal. He says that the minutes of purported meetings of directors and shareholders of The Mall were false and that the

$1,030,000 note and deed of trust were false and fraudulent and part of a scheme to deprive him of the proper security on the deed of trust he was to receive. He says that General Harrison of the First National Bank should have known from the crude seal that the deed of trust presented to him was not a valid obligation of The Mall, but that he nevertheless agreed to purchase the note and deed of trust. Hawkins says that Petersen was sent to the closing to represent the bank and Title Insurance Corporation, with instructions that no disbursement would be made until Petersen was satisfied with the closing arrangements. He says that, when Petersen learned about the $100,000 deed of trust, Petersen began to take steps to assure that the $100,000 deed of trust was inferior to the bank's deed of trust. According to Hawkins, Petersen prevailed upon Sutliffe to insert in Hawkins' deed of trust "a clause in vague, ambiguous and clever language designed to subordinate the lien thereof to the lien of First National Deed of Trust." Hawkins says that no one called his attention to the subordination clause at the October 11th closing because they did not want him to know about it. He says that when his deed of trust was recorded on October 11, following recording of the Title Insurance Corporation security agreement, his security was in fact a third, not a second, deed of trust, and that to lend color to the concept of a second deed of trust, Petersen, as the first disbursement under the construction loan from First National, paid off the $60,000 Systematic deed of trust.

These suppositions simply do not accord with the facts, either as found by the trial court, or by us on our review. There is no basis for the charge that Sutliffe and Eoff secretly planned to take advantage of Hawkins. Noteworthy is the fact that Eoff, on his appeal, charges that the conspirators were Hawkins and Sutliffe. Eoff did bring Sutliffe into the deal, but wholly by chance. Sutliffe saw Eoff when he came to Springfield, but he also saw Hawkins. Although both Hawkins and Eoff sought to

deny that each knew what the other's dealings with Sutliffe were, the inescapable conclusion from the over-all testimony is that both were kept in touch with what occurred. Hawkins was not at the October 8th meeting, but, since the matters there dealt with assumed the conclusion of the transaction, there was no particular occasion for him to be. Although Hawkins testified that the September 4th deed to The Mall was delivered to Escrow Facilities with instructions to hold it for the final closing, no objection was made at the final closing to the earlier recording of the deed. Hawkins sought to appear ignorant of Sutliffe's plans to refinance the construction of the new motel, but Hawkins knew enough of what was going on to have been aware that refinancing was necessary and that a construction loan was the most probable way of completing the project. Hawkins conferred with the attorney for the Turners about the latter's execution of the consent agreement, which referred to a note and deed of trust to be executed by The Mall to Mid-Continent and to the possibility of the assignment of the note and deed of trust to First National or Republic National. Hawkins' denial of knowledge of the contents of the consent agreement is not credible. He requested the Turners to sign it, asserting that their consent was urgent. He was present in the office of the Turners' attorney when the provisions of the agreement were discussed. His effort to avoid knowledge which its contents would impart, including knowledge of the proposed construction loan, is rejected. The credulity of Hawkins' claim that he did not know that his $100,000 deed of trust was to be second to the lien of such a loan, and that he believed the contract to mean that it was to be second only to the $60,000 Systematic deed of trust is rendered highly suspect by Hawkins' delay in asserting such claim. His original suit, filed January 27, 1964, against The Mall, Inc., Sutliffe, Sofio, and Anlee, sought judgment only on the note. No claim of fraud on anyone's part was asserted. At that time,

Hawkins had the deed of trust, with the subordination clause in clear language on its face. Construction was proceeding and the First National was advancing funds on its loan. The first mention of fraud appeared in plaintiffs' motion to add parties, filed July 31, 1964. The allegation of fraud appeared in the first amended petition, filed August 10, 1964. Between January 27 and August 10, First National advanced $188,000, without any knowledge that Hawkins was asserting the first lien on The Hawks property. Not until the new construction had been practically completed did any such claim become known.

The only circumstance giving any semblance of credence to Hawkins' charge of a conspiracy to defraud him was the procedure for the insertion of the subordination clause in his deed of trust. We find the facts on this matter to be that Petersen, enroute to Springfield with Sutliffe for the closing on October 10, 1963, became aware of the $100,000 deed of trust going to the Hawkinses. When he and Sutliffe went to the office of Escrow Facilities, Petersen with Sutliffe and Max Lilley discussed the insertion of a provision in the $100,000 deed of trust to show it inferior to the $1,030,000 deed of trust. Lilley told Petersen that there was no need for such a clause because the prior recording of the $1,030,000 deed of trust gave it priority. Petersen was insistent, however, that such a clause be inserted and Sutliffe either typed in or had typed at the Escrow Facilities office the subordination clause. Sutliffe testified that he pointed out the subordination clause to Hawkins. Hawkins denied that this was done. Neither Petersen nor Lilley discussed the insertion of the clause with Hawkins. Hawkins' attorney testified that when he examined the Hawkins' deed of trust at the closing on October 11, he saw no subordination clause. However, the indication is that the attorney did not scrutinize the document closely. Otherwise, he might have observed that the deed of trust was on a form for use in St. Louis with provision for sale at the St. Louis

Civil Courts building. We do not consider that Walker's failure to note the subordination clause disproves the testimony of Petersen, Sutliffe and Lilley to the effect that the clause had been written on the 10th and that it was on the deed of trust when it was presented among the closing documents on October 11. Nor can we accept the appellants' Hawkins characterization of the subordination clause as being "in vague, ambiguous and clever language * * *." The language of the clause is clear, unambiguous, and on the face of the instrument. The fact that it was not actually discussed with Hawkins prior to the closing is not proof of the conspiracy to defraud, asserted by Hawkins. We find that Hawkins had every reason to know that the construction loan was being made. He certainly knew that the Systematic deed of trust was paid off on the closing date. Far from establishing a conspiracy, we find that the credible evidence shows that Hawkins received what his contract entitled him to when he got a deed of trust, second to the $1,030,000 obligation. His claim of fraud is wholly without substance.

■ The answer of the defendant Mall to plaintiffs' claim asserted the invalidity of the $100,000 note and deed of trust securing it. The defenses asserted were that The Mall received no consideration for the note because it was given in payment of property already owned by it. The second defense was that the transaction reduced the stated capital of The Mall, in violation of the laws of the State of Missouri. The trial court made no express findings on either of these defenses. The court did find that the Hawkinses were holders in due course of the $100,000 note, inferentially holding, it appears, that the defenses could not be asserted against them by virtue of their status as holders in due course. However, the Hawkinses were payees of the note and, as such, could not have been holders in due course. Popovsky v. Griwach, 361 Mo. 1120, 238 S.W.2d 363, 365 [1]; Mutual Life of Illinois v. McKinnis, Mo.App., 15 S.W.2d 935, 936 [1]. Consideration of the defenses

of The Mall may not be avoided on the basis assigned by the trial court. Mutual Life of Illinois v. McKinnis, supra.

The basis of The Mall's assertion of lack of consideration is that Hawkins, at the time of the contract with Anlee, was obligated to transfer The Hawks to The Mall in order to carry out the understanding between Hawkins and Eoff for the issuance of shares of The Mall for the contribution by Hawkins and Eoff of property to the corporation. The trial court found that, although at the October, 1962 meeting of Mall stockholders, the transfer of The Hawks in the property covered by the Farm & Home deed of trust evidenced an intention to make The Hawks a part of Hawkins' contribution to The Mall. Relying upon this finding, The Mall asserts that, in equity, The Hawks was, at the time of the contract between Hawkins and Anlee, the property of The Mall in return for the 1500 shares of stock to which Hawkins was entitled. Therefore, they assert that the ultimate imposition upon The Mall of the obligations to Hawkins required the corporation to pay again for what it already owned and, therefore, there was no consideration to The Mall for its assumption of such obligations.

Although offering citation of authority in support of their preliminary propositions, The Mall offers no citation of authority in support of their ultimate conclusion that the transaction as to The Mall was without consideration and void.

■ Insofar as consideration essential to the validity of the note and deed of trust securing it is concerned, Hawkins did part with something of value, be it his stock or his motel. This was a legally sufficient consideration for an undertaking to compensate him, whether or not the consideration went directly to the obligor of the note given in payment. Shayne of Miami, Inc. v. Greybow, Inc., 232 S.C. 161, 101 S.E.2d 486. "It is not essential to the validity of a mortgage that the mortgagor should have received the consideration; it is sufficient that the mortgagee parted with

the consideration." 59 C.J.S. Mortgages, § 88, p. 133. See Munday v. Austin, 358 Mo. 959, 218 S.W.2d 624, 629 [7]; Bank of Moberly v. Meals, 316 Mo. 1158, 295 S.W. 73, 77 [11, 12].

The assertion of illegal reduction of stated capital of The Mall by the transaction is based on the theory that the transaction, insofar as The Mall was concerned, involved the purchase by it of its own capital stock at a time when its net asserts did not exceed its stated capital, bringing the transaction within the prohibition of § 351.390, RSMo 1959, V.A.M.S. That section provides:

"A corporation shall have power to purchase, take, receive, or otherwise acquire, hold, own, pledge, transfer, or otherwise dispose of its own shares; provided, that it shall not purchase, either directly or indirectly, its own shares when its net assets are less than its stated capital, or when by so doing its net assets would be reduced below its stated capital. Notwithstanding the foregoing limitation, a corporation may purchase its own shares for the purpose of:

"(1) Eliminating fractional shares;

"(2) Collecting or compromising claims of the corporation, or securing any indebtedness to the corporation previously incurred;

"(3) Paying dissenting shareholders entitled to payment for their shares in the event of a merger or consolidation or a sale or exchange of assets;

"(4) Effecting, subject to the other provisions of this chapter, the retirement of its redeemable shares by redemption or by purchase at not to exceed the redemption price."

We will not detail the evidence from which it might be determined that the net assets of The Mall in October, 1963 were not adequate to permit its purchasing or paying for its own stock. Assuming that such was the situation, what effect does the violation of § 351.390 have upon the $100,000 note and deed of trust given to secure it? Cases antedating the enactment (Laws of Mo.

1927, p. 387) of the predecessor provision to § 351.390 condemned corporate dealing in its own stock. Hunter v. Garanflo, 246 Mo. 131, 151 S.W. 741, 742 [1], found a transaction, similar in several respects to that of the present case, by which a corporation mortgaged its property for the payment of its shares transferred by a stockholder to another, "contrary to * * * sound public policy." Botz v. Helvering, 134 F.2d 538 (8th Cir.), states that corporate purchase of its own stock, other than as authorized by statute, is, under Missouri law, "void as against public policy." 134 F.2d 543. See also Townsend v. Maplewood Investment & Loan Co., 351 Mo. 738, 173 S.W.2d 911.

Section 351.390, supra, does not declare transactions contrary to its requirements void. If the court is to declare such a result, the case presented should be one in which that result would subserve the public policy embodied in the statute. The essential policy consideration involved in the statutory regulation of corporate dealing in its own stock is protection of the interests of creditors or other stockholders. Here, the other stockholders, the Eoffs, as is more fully developed in connection with their appeal, assented to and approved the transaction. No rights of creditors existing at the time are claimed to be involved. The subsequent creditor, Southern Commercial and Savings Bank and its subsidiary, S & G Lessors, assert no defense on the basis of violation of § 351.390, supra. As subsequent creditors, they would have no standing to do so. 6A Fletcher on Corporations, § 2861, p. 406. Coleman v. Hagey, et al., 252 Mo. 102, 158 S. W. 829, 843 [24]. Those corporations would, however, be the principal beneficiaries of a declaration that the $100,000 note and deed of trust securing it are void. The same policy considerations would be involved if the case should be considered as one involving an unauthorized reduction of stated capital, under § 351.195, RSMo 1959, V.A.M.S.

We conclude that no considerations of policy are presented here that call for the

sustaining of the defense of The Mall against the claim on the $100,000 note. See Otsego Paper Stock Co. v. Slosberg, 230 Mich. 260, 202 N.W. 991.

Hunter v. Garanflo, supra, also relied on the doctrine of ultra vires in voiding the transaction involved in that case. As pointed out in Title Guaranty Trust Co. v. Sessinghaus, 325 Mo. 420, 28 S.W.2d 1001, 1006–1007, application of the ultra vires doctrine in Hunter was unsound.

■ The counterclaim of The Mall sought to rescind the transaction and judgment for $100,000 damages against the Hawkinses and Sutliffe and Sofio on the grounds that the transaction was designed to cheat and defraud The Mall so that Hawkins would receive the assets of the corporation and Sutliffe and Sofio one half of its capital stock. On this appeal, the fraud is alleged to be primarily in self-dealing by the individuals involved with the assets of the corporation. The general requirements of the fiduciary duties of corporate officers and directors in management of corporate affairs and dealing with corporate property are well established. See Frankford Exchange Bank v. McCune, Mo. App., 72 S.W.2d 155, 158 [1–4]. Again, however, the primary object of such requirement is protection of the rights of stockholders and creditors. Thus, a stockholder who is fully aware of the dealings by a director or officer with a corporation and who acquiesces in or consents to the transaction has no standing to attack that transaction on behalf of the corporation. Ramacciotti v. Joe Simpkins, Inc., Mo., 427 S.W.2d 425, 431–432 [5–10]. Although the general rule is that corporate properties may not be used to pay the individual debts of its officers and directors (Duncan v. Ponton, Tex.Civ.App., 102 S.W.2d 517), consent of the stockholders to such action produces different consequences. Where rights of creditors are not affected, a corporation may, with the consent of its stockholders, pledge corporate assets to secure the personal indebtedness of one of its officers.

"The rational basis for this power to pledge the corporate collateral is the well-recognized principle of law that, subject to the rights of creditors, a corporation may give away its property or pay out money from its treasury if the stockholders consent and the act is not illegal." MacQueen v. Dollar Savings Bank Co., 133 Ohio St. 579, 15 N. E.2d 529, 117 A.L.R. 1258, 1261.

In Frankford Exchange Bank v. McCune, supra, the rights of creditors were involved and the contract between the bank and its directors under which the latter received assets of the bank in return for their acting as securities for the deposit of county funds was held void. No rights of creditors are claimed to be involved here. Bromschwig v. Carthage Marble & White Lime Co., 334 Mo. 319, 66 S.W.2d 889, was a non-assenting shareholder's action for an accounting and the appointment of a receiver on the grounds of self-dealing by the general manager of a corporation.

S & G Lessors, Inc. and Southern Commercial and Savings Bank, as appellants, also assert that the $100,000 note was without consideration to The Mall and that the note and deed of trust securing it should be held void. What was said with regard to this contention as advanced by The Mall is applicable to the contention of these appellants.

Southern Commercial and Savings Bank also urges, as a stockholder of The Mall, that The Mall should be given judgment against plaintiffs on its counterclaim because the Hawkinses' receipt of corporate assets for sale of their stock violated their fiduciary duties. Southern Commercial and Savings Bank is a stockholder in The Mall, Inc., through Sutliffe who received the stock in the transaction which Southern Commercial and Savings Bank now attacks. "Stockholders who have acquired their stock and interest in the corporation from the alleged wrongdoer, and through the prior mismanagement of the corporation's affairs, have no standing to complain thereof." 19 Am.Jur.2d Corporations, § 558, p. 90.

S & G Lessors, Inc. and Southern Commercial and Savings Bank, in their appeal, contend that the trial court erred in causing the judgment in favor of plaintiffs and against The Mall and Sutliffe to be a lien on The Hawks property, owned by S & G Lessors, because no money judgment was rendered against S & G Lessors. However, this argument is premised on the invalidity of the deed of trust. We have concluded that the $100,000 deed of trust is valid. It unquestionably was a lien on the property to which the interest of S & G Lessors was subject. The judgment forecloses the equity of redemption under the deed of trust and, under § 443.240, RSMo 1959, V.A.M.S., the money judgment was properly made a lien against the property subject to the deed of trust.

The Eoffs' appeal is based on the claim that the evidence established that they, as stockholders, were defrauded by the Hawkinses and Sutiffe, and that the judgment in their favor on this basis against Sutliffe should also have been against the Hawkinses.

Essentially, the claim of the Eoffs is that Hawkins and Sutliffe falsely represented to them that Hawkins was selling his interest in The Mall, Inc. to Sutliffe and his associates, and that this representation was false and fraudulent because the purchase price of whatever Hawkins sold was, in fact, paid by The Mall, Inc. They also charge that the scheme was a fraud upon them as stockholders because the transaction resulted in the employment of the capital of The Mall, Inc. to pay for its own shares, thereby reducing its stated capital in violation of public policy.

The difficulty with the Eoffs' position is that it ignores their willing participation in the whole transaction from its very inception. They became disenchanted with their original undertaking to join with Hawkins in the new motel and restaurant project. Whatever the cause for the disagreement, Eoff, as the bookkeeper for the project, must have been aware of its status when he sought out Sutliffe to take over Hawkins' interest. In his testimony Eoff adopted somewhat the same tactics as Hawkins, endeavoring to know as little as possible about the transaction. The trial court disbelieved his testimony that the signature of "Archie Eoff" appearing on the original handwritten agreement between Hawkins and Sutliffe for Anlee was not his signature. Comparison of the signature on the document with specimens written at the time of Eoff's testimony certainly refutes Eoff's disavowal of the signature. Likewise, Eoff's disclaimer of receipt of a copy of the formal agreement is not credible. If Eoff did not know what was going on, the only possible explanation is that he simply refused to know. The explanation offered in their brief is that "no sane, logical person could have known, could have understood, and consented to [the transaction]." The fact remains that the Eoffs signed and approved the minutes of at least purported meetings of stockholders and directors of The Mall in which the transaction was set out, without any effort to conceal its details and effect. Certainly, if anyone was in a position to know the status of the ownership of The Hawks property, Eoff was. He knew what the arrangement with Hawkins was. He knew that Hawkins was supposed to transfer The Hawks to The Mall free of encumbrances, but he consented to the assumption of the $60,000 deed of trust. Eoff was wholly familiar with the $40,000 advance by The Mall to Hawkins. He consented to its being forgiven. He certainly must have known that The Mall was giving Hawkins a $100,000 deed of trust, in addition to $25,000 in cash and a $25,000 note. In retrospect, it is obvious that this was a very poor deal for Eoff, as the owner of 50% of the stock of The Mall, Inc. Yet, one in a position of knowing, or at least certainly able to know, what was happening, cannot be heard to cry fraud when the probably inevitable failure of the venture occurs. We do not know what caused Eoff to ignore the almost obvious consequences of the transaction. However, we cannot find any support for the theory that he did so because

of false or fraudulent representation of Hawkins. Perhaps Eoff was so anxious to get rid of Hawkins that he just chose to ignore the obvious. Certainly, he took little stock in the advice of his attorney that the agreement whereby Eoff in effect, surrendered control of the corporation to Sutliffe was "a bad deal" for Eoff. "Although the law affords to everyone reasonable protection against fraud, 'it.is not an indulgent guardian which can go to the romantic length of giving protection against the consequences of indolence, folly or careless indifference to the ordinary and accessible means of information.'" Herhalser v. Herhalser, Mo.App., 401 S.W.2d 187, 192 [3].

■ The Eoffs also seek relief on the grounds that the transaction involved an illegal invasion of the stated capital of The Mall, Inc. The Eoffs rely upon the same authorities advanced by The Mall and other parties, asserting the invalidity of the transaction under § 351.390, supra. Hunter v. Garanflo, supra, Botz v. Helvering, supra, and Townsend v. Maplewood Investment & Loan Co., supra, are cited in support of the Eoffs' appeal. These authorities are inapplicable to the facts presented in this case and afford no basis for relief to the Eoffs as assenting shareholders in the transaction.

The judgment is affirmed.

HOUSER, C., not sitting.

HIGGINS, C., concurs.

PER CURIAM:

The foregoing opinion by WELBORN, C., is adopted as the opinion of the Court.

SEILER, P. J., and STORCKMAN, J., HENLEY, Alternate J., and STUBBS, Special J., concur.

HOLMAN, J., not sitting when cause was submitted.