**In re WISCONSIN BARGE LINE, INC., et al., Debtors.**

**CLC OF AMERICA, INC., Plaintiff,**

**v.**

**LAKE SHORE EQUIPMENT DISTRIBUTORS, INC., Defendant.**

**Bankruptcy No. 86–00016(SE).**

**Adv. No. 86–0057(SE).**

United States Bankruptcy Court, E.D. Missouri, Southeastern Division.

April 30, 1987.

Gregory D. Willard, St. Louis, Mo., for CLC.

George S. Wright, Phoenix, Ariz., Curtis L. Mann, St. Louis, Mo., for Lake Shore.

## MEMORANDUM OPINION

DAVID P. McDONALD, Bankruptcy Judge.

### INTRODUCTION

On November 7, 1986, CLC of America, Inc. ("CLC") filed a Complaint seeking to

subordinate the claim of Lake Shore Equipment Distributors, Inc. ("Lake Shore") under Section 510(b) of the Bankruptcy Code. On January 12, 1987, Lake Shore filed an Answer showing there to be no genuine issue as to any material fact. The matter being ripe for summary judgment, each party so moved, whereupon the Court held a hearing on the opposing motions on February 27, 1987. Upon the pleadings and briefs of the parties, the argument of counsel, all other matters of record, and for the reasons set forth below, the Court this date will grant judgment for CLC subordinating the claim of Lake Shore.

UNCONTESTED FACTS

On February 15, 1984, CLC and Richard Kelly ("Kelly"), President of Lake Shore, entered into a Stock Purchase Agreement. Pursuant to this agreement, Kelly agreed to purchase all the issued and outstanding stock of Interstate Tractor and Equipment Company and Contractors Machinery Company (the "Companies"), at that time wholly owned subsidiary corporations of CLC. Simultaneously, CLC, Kelly and Lake Shore entered into a companion and corresponding Stock Contribution Agreement, whereby Kelly agreed to contribute the stock in the Companies to the capital of Lake Shore.

On or about December 28, 1984, Lake Shore filed suit against CLC in Arizona state court. Lake Shore alleged in its state court complaint that the Stock Purchase Agreement and the Stock Contribution Agreement involved fraud, negligent misrepresentation, breach of contract, breach of express warranties and violations of the Arizona racketeering laws on the part of CLC. Based on these allegations, Lake Shore demanded recision of the agreements or damages in the sum of $10,500,000.

On January 13, 1986, CLC filed its voluntary Chapter 11 petition in this Court, automatically staying the Arizona proceeding. On May 15, 1986, Lake Shore moved to modify the automatic stay so as to permit it to continue its Arizona state court action against CLC. On August 26, 1986, the Court denied Lake Shore's motion. *In re*

*CLC of America, Inc.*, 68 B.R. 512 (Bankr. E.D.Mo.1986).

On July 10, 1986, Lake Shore filed Proof of Claim No. 22, claiming $10,500,000 as a general unsecured claim against CLC. In its Proof of Claim Lake Shore alleged the same causes of action as in its suit against CLC in Arizona state court. On November 7, 1986, CLC filed the instant adversary proceeding seeking to subordinate Lake Shore's claim under 11 U.S.C. § 510(b).

JURISDICTION

This Court has jurisdiction over the parties and subject matter of this proceeding pursuant to 28 U.S.C. §§ 1334, 151, and 157 and Local Rule 29 of the United States District Court for the Eastern District of Missouri. This is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2)(B), which the Court may hear and determine.

DISCUSSION

One of the reasons the Court gave for not granting Lake Shore's request to lift the stay was the possibility that Lake Shore's claim might be subject to subordination. The Court stated that:

"Section 510(b) of the Bankruptcy Code provides that

'for the purpose of distribution under this title, a claim arising from recision of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under Section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such a security is common stock, such claim has the same priority as common stock.'

Since Lakeshore's claim *appears* to fall squarely within the statutory language, the Court concludes that its claim may subordinate to those of the general unsecured creditors and will share, if at all, with the Debtor's equity security holders."

68 B.R. at 514–15.

CLC argues that Lake Shore's claim not only appears to, but does, in fact, fall with-

in the statutory language of Section 510(b). Lake Shore, on the other hand, argues that there are two reasons why its claim cannot be subordinated under Section 510(b). The Court will examine each of Lake Shore's arguments in turn.

■ First, Lake Shore notes that Section 510(b) provides for subordination of claims for damages arising from the purchase of *securities*. Lake Shore argues that it did not purchase securities from CLC. Lake Shore, therefore, concludes that Section 510(b) does not apply to its claim.

Section 101(43)(A)(ii) of the Bankruptcy Code clearly states that "security means stock". Thus, under the Bankruptcy Code definition, Lake Shore's purchase of all of the stock in the Companies was the purchase of securities.

Lake Shore, however, urges the Court to look to the federal securities laws for its definitions of "security". According to Lake Shore, under the so-called "Sale of the Business Doctrine", if *all* of the stock of a business is sold, the transaction does not constitute the sale of *securities* for purposes of the federal securities laws. *Landreth Timber Co. v. Landreth*, 731 F.2d 1348 (9th Cir.1984). Thus, Lake Shore concludes that under this definition CLC's sale of the Companies to it did not constitute the sale of securities and its claim against CLC, therefore, is not subject to subordination under Section 510(b).

Even were this Court to look to the federal securities laws for its definition of "security", that would not avail Lake Shore; for in 1985 the Supreme Court reversed *Landreth* and held that the sale of all of the stock of a business is a securities transaction subject to the anti-fraud provisions of the federal securities laws. 471 U.S. 681, 105 S.Ct. 2297, 85 L.Ed.2d 692 (1985). Since under either the Bankruptcy Code or the federal securities laws CLC's transaction with Lake Shore involved the sale and purchase of securities, Lake Shore's first argument has no merit whatsoever. The Court, therefore, holds that CLC's sale of all the stock of the Companies to Lake Shore did constitute the sale of securities within the meaning of Section 510(b).

■ In its second argument, Lake Shore notes that Section 510(b) provides for subordination of claims for damages arising from the purchase of securities of an *affiliate* of the debtor. Under Section 101(2) of the Bankruptcy Code " 'affiliate' means ... corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor ..." Lake Shore argues that although the Companies were affiliates of CLC at the time CLC sold all the stock in them to Lake Shore, they were *not* CLC's affiliates at the time CLC filed its Chapter 11 petition. According to Lake Shore, Section 510(b) only provides for subordination of claims for damages arising from the purchase of securities of corporations which are affiliates of the debtor on the date of bankruptcy. Put another way, Section 510(b) does *not* apply to claims arising from the purchase of securities of corporations which were formerly affiliates of the Debtor but not so on the date of bankruptcy. Therefore, Lake Shore concludes that since the Companies were not CLC's affiliates when CLC filed bankruptcy, Lake Shore's claim cannot be lawfully subordinated under Section 510(b).

The Court is not persuaded by Lake Shore's second argument. Section 510(b) codifies the policy that the "risk of illegality in securities issuance should be borne by those investing in securities and not by general creditors." H.R.Rep. No. 595, 95 Cong., 2d Sess. at 195, *reprinted in* 1978 U.S.Code Cong. & Ad.News, pp. 5787, 6156; *see also, In re Flight Transportation Corp. Securities Litigation*, 730 F.2d 1128, 1136–37 (8th Cir.1984). Considering that policy, suppose one day before filing bankruptcy a debtor illegally issued securities consisting of 79 percent of the stock of a subsidiary corporation. Suppose further that the debtor corporation continued to own the remaining 21 percent of the stock of the subsidiary corporation on the date of its bankruptcy filing. Since the debtor still owned 21 percent of the stock of the subsidiary on the date of bankruptcy, the sub-

sidiary would be an affiliate even under Lake Shore's view and the purchaser of the securities would have a claim subject to subordination under Section 510(b). Changing this hypothetical slightly, if one day before filing bankruptcy the same debtor illegally issued securities consisting of 81 percent or more of the stock of that subsidiary, then the subsidiary would *not* be an affiliate on Lake Shore's view and the purchaser of the securities would not have a claim subject to subordination under Section 510(b). On Lake Shore's view, then, general creditors would begin to bear the risk of illegality of securities issuance just when claims arising from such illegality became most damaging to the interests of general creditors.

If the policy of Section 510(b) is to protect the estate's general creditors, that policy certainly would be thwarted by a construction of the statute which would deny protection to general creditors just when they needed it most. Since that would be the effect of Lake Shore's construction, this Court holds that for the purposes of Section 510(b) " 'affiliate' means ... corporation 20 percent or more of whose outstanding voting securities are or were at the time the claim arose directly or indirectly owned, controlled, or held with the power to vote, by the debtor ..." The Court, therefore, concludes that Lake Shore's purchase of all the stock of the Companies did constitute the purchase of securities of affiliates of CLC within the meaning of Section 510(b).

For the foregoing reasons, the Court will this date deny Lake Shore's Motion For Summary Judgment, grant CLC's Motion For Summary Judgment and subordinate Lake Shore's claim pursuant to the provisions of Section 510(b).