In re STERN–SLEGMAN–PRINS COM-PANY, S.S.P. Realty Corporation, Braemoor Garment Co., Inc., Suburban Casuals, Inc., Westport Casuals, Inc., Debtors.

Bankruptcy Nos. 84–00812–1–11 to 84–00816–1–11.

United States Bankruptcy Court, W.D. Missouri, W.D.

May 19, 1988.

John Donner, Stinson, Mag & Fizzell, Overland Park, Kan., for debtors.

Paul Hoffman, Lathrop, Koontz, Righter, Clagitt & Norquist, Kansas City, Mo., for trustees, Slegman Trust, Boatmen's Bank.

Morris J. Levin, Levin & Weinhaus, St. Louis, Mo., and Marc Richards, Booth, Marcus & Pierce, New York City, for ILGWU Nat. Retirement Fund.

## MEMORANDUM OPINION AND ORDER

KAREN M. SEE, Bankruptcy Judge.

Pending is debtors' Second Amended Plan of Reorganization.[1] Debtors are substantively consolidated. At issue is a provision to subordinate claims arising under two stock repurchase agreements entered into August 3, 1965 between debtor Stern–Slegman–Prins Company ("Stern–Slegman") and shareholders Arthur Mag and Ferdinand Stern. The trustees of the Stern estate, Boatmen's First National Bank and Donald Chisholm ("Trustees"), object to subordination and voted against the plan. The subordination proposal resulted from last minute negotiations between debtors and the ILGWU National Retirement Fund ("Fund"). The Trustees' Class 4 claim of $720,000 and the Fund's Class 3 claim of $1.8 million are both unsecured. The Fund agreed to reduce its claim by half in exchange for subordination of the Trustees' claim.

If the plan is confirmed the Trustees will receive no payment on their claim and the Fund would receive about 82% (estimated at $187,780) of funds distributed to unsecured creditors. If the Fund's claim is not voluntarily reduced by half and the Trustees' claim is not subordinated, so that both are treated as general unsecured creditors, after payment of all priority and administrative expense claims, the Fund would receive about 66% of distributed funds, the Trustees would receive about 26% and other unsecured creditors would receive an estimated 8%. If the Trustees were treated as general unsecured claimants they would receive approximately $59,540 and the Fund, on its unreduced claim of $1.8 million, would receive about $151,140.[2] After the hearing the parties were directed to brief the issue of equitable subordination. Briefs were filed by the Trustees and the Fund. No objections to or briefs in support of the plan were filed by debtor or other creditors.

## FACTS

The Trustees alleged the following facts, which were not contested by the Fund. On

---

1. The confirmation hearing was heard by Judge Frank Barker, deceased. With consent of the parties, this Court determined it was appropriate to rule the matter based on the transcript.

2. In March, April and October, 1987, the Court ordered payment of approximately $298,000 in satisfaction of all tax, priority, attorney fee and administrative claims. Cash on deposit is the estate's sole asset. As of May 18, 1988, about $229,000 remained for unsecured claims which, at confirmation, were noted as $1.8 million (66% of total) for the Fund, $720,000 (26%) for the Trustees, and $200,000 (8%) for other unsecured creditors. If the Trustees' claim is not subordinated, distribution would be: the Fund, $151,140 (66% of $229,000); the Trustees, $59,540 (26%), and other unsecureds, $18,320 (8%). If the Trustees' claim is subordinated, so the Fund's $1.8 million claim is voluntarily reduced to $900,000, the Fund will receive $187,780 (82% of $229,000), other unsecured claims totaling $200,000 would receive $41,220 (18%), and the Trustees' subordinated claim would receive zero distribution. The Fund would receive approximately $36,640 more if the Trustees' claim is subordinated.

August 3, 1965, Mr. Stern entered a stock repurchase agreement with Stern–Slegman which provided that upon Mr. Stern's death his estate would sell and Stern–Slegman would buy all common stock of the company then held by Mr. Stern.[3] The parties had nine months after death to consummate the transaction. Mr. Stern died in August 1970. On April 19, 1971, pursuant to the agreement, Stern–Slegman purchased 30,000 shares of its common stock from Mr. Stern's estate for $735,132. The terms of the purchase were $100,000 from life insurance proceeds, the balance of $635,132.95 to be paid in annual installments over 20 years, and quarterly interest payments at five percent. On April 19, 1971 Stern–Slegman had surplus capital of $1,628,530. For the next 10 years, Stern–Slegman's surplus capital was between $1.3 and $2.1 million. Between September 30, 1980 and March 31, 1981, surplus capital decreased from $1.3 million to $933,017. On March 31, 1982 surplus capital decreased again to $196,508, then to a negative balance of $413,169 on March 31, 1983. When Stern–Slegman filed bankruptcy on March 14, 1984 its surplus capital was a negative $997,786.

## VALIDITY UNDER STATE LAW

■ The Fund raises the threshold question whether Stern–Slegman's repurchase of its shares is valid under Missouri law. Section 351.390 RSMo. (1986) (enacted in 1943) provides:

A corporation shall have power to purchase, take, receive, or otherwise acquire, hold, own, pledge, transfer or otherwise dispose of its own shares; provided, that it shall not purchase, either directly or indirectly, its own shares when its net assets are less than its stated capital or when by so doing its net assets would be reduced below its stated capital.

The Fund contends § 351.390 requires a surplus both when the agreement was made and when any distribution under the agreement is made.[4] It does not contest the fact that a surplus existed at the time the agreement was entered into and thereafter until March 31, 1985, almost eleven years after the repurchase option was exercised. The Trustees, on the other hand, contend the statute requires a surplus only at the time the agreement was entered into.

Since enactment, § 351.390 has been the subject of only one reported Missouri decision, *Hawkins v. Mall, Inc.*, 444 S.W.2d 369 (Mo.1969). In *Hawkins* a corporate note was given as part of the consideration for a buy out by a third party of one shareholder's interest. The corporation defaulted on the note and the former shareholder sued. The corporation asserted that the transaction violated § 351.390 and apparently argued that the note should be declared void as a result of the violation of state law. The court assumed the corporation's net assets were inadequate to purchase its own stock at the time the transaction was closed and the shares were issued to the third party. The court then held:

Section 351.390 ... does not declare transactions contrary to its requirements void. If the court is to declare such a result, the case presented should be one in which that result would subserve the public policy embodied in the statute. *The essential policy consideration involved in the statutory regulation of corporate dealing in its own stock is protection of the interests of creditors or other stockholders.* Here, the other stockholders ... assented to and approved the transaction. No rights of creditors existing at the time are claimed to be involved. The subsequent creditor[s] ... assert no defense on the basis of violation of § 351.390 .... As subsequent creditors, they would have no

---

**3.** The repurchase agreement and promissory note were not in the record. However, the Fund does not contest the existence or the terms as set out by the Trustees.

**4.** The Fund also argues that *Botz v. Helvering,* 134 F.2d 538 (8th Cir.1943), applies and there-

fore the stock repurchase agreement is void as against public policy. As Trustees point out, *Botz* was overruled by enactment of § 351.390. See, *Hawkins v. Mall, Inc.,* 444 S.W.2d 369, 386 (Mo.1969).

standing to do so. ... Those corporations would, however, be the principal beneficiaries of a declaration that the $100,000 note and deed of trust securing it are void.

Under *Hawkins,* even if a transaction did not comply with § 351.390, it would still be valid and enforceable unless a court found that the interests of existing creditors and shareholders were unprotected. Here, neither the bylaws nor minutes of any shareholder meetings, from which the Court might discern shareholder consent, have been admitted into evidence. However, neither the debtor nor any other shareholder has contested the validity of the repurchase agreement. The only party contesting its validity under state law is the Fund and it does not contest the Trustees' assertion that the Fund is a subsequent creditor. Thus, none of the parties that the statute protects have contested the validity of the repurchase agreement.

Moreover, there is no evidence or contention that the rights of any creditor in existence at the time the repurchase option was exercised and the indebtedness incurred have been prejudiced. Nor is there any contention that the Trustees have placed themselves in a better position in relation to creditors existing at that time as a result of the repurchase agreement. Because shareholder and existing creditors' rights are protected if the agreement is enforced, the Court finds that under the *Hawkins* decision the repurchase agreement should not be declared void.

■ The Court acknowledges the parties' arguments concerning whether the Missouri statute should be construed as applying the surplus test on the date the indebtedness is incurred—referred to as an "outset" test, or each time an installment on the payment of the debt is made—referred to as an "installment test." For the following reasons this Court alternatively finds that, if faced with this issue and under the facts of this case, Missouri courts would require solvency only on the

date the repurchase option was exercised and the debt incurred. First, in determining whether a repurchase agreement is effective, *Hawkins* implies the date the repurchase transaction is consummated is the appropriate date to measure capital surplus. *Hawkins,* 444 S.W.2d at 386.

Second, when *Hawkins* was decided a majority of courts applied the installment test requiring solvency on the date of repayment. *See, e.g., McConnell v. Estate of Butler,* 402 F.2d 362, 366 (9th Cir.1968); *Matter of Trimble Co.,* 339 F.2d 838, 842–43 (3d Cir.1964); *Mountain State Steel Foundries, Inc. v. Commissioner,* 284 F.2d 737 (4th Cir.1960); *Robinson v. Wangemann,* 75 F.2d 756, 757 (5th Cir.1935); *Boggs v. Fleming,* 66 F.2d 859 (4th Cir. 1933); *In re Fechheimer Fishel Co.,* 212 F. 357 (2nd Cir.1914). Thus, the Missouri Supreme Court could have followed the majority view, but instead chose to interpret § 351.390 to require solvency only at the outset of the transaction. *See* Case Comment, *Corporation Stock Repurchase— Surplus Test Application Date,* 35 Mo.L. Rev. 423 (1970).

Third, when faced with judicial interpretations of stock repurchase statutes, other state legislatures have altered their statutes to reflect the legislature's intent when it conflicts with the judicial interpretation. For example, in *Kleinberg v. Schwartz,* 87 N.J.Super. 216, 208 A.2d 803 (App.Div.), *aff'd on opinion below,* 46 N.J. 2, 214 A.2d 313 (1965), the court overruled an earlier decision rejecting the installment test and applying the outset test. *See, Wolff v. Heidritter Lumber Co.,* 112 N.J.Eq. 34, 163 A. 140 (Ch.1932). The *Kleinberg* decision was legislatively overruled and the *Heidritter* decision reinstated with the enactment of New Jersey Statute § 14A:7–16(6) (West 1969).[5] The Missouri legislature never altered § 351.390 to legislatively overrule *Hawkins,* indicating that it is the legislature's intent that an outset test be applied to stock repurchase transactions.

---

**5.** The statute provides: "A corporation which has purchased its own shares out of surplus may defer payment ... the validity of any pay-

ment made upon the debt so created shall not be affected by the absence of surplus at the time of such payment."

Fourth, § 351.195.6 RSMo. (1988 Supp.), the Missouri statute governing distributions to shareholders, provides:

No *distribution of assets* to shareholders in connection with the reduction of stated capital shall be made out of stated capital unless the assets of the corporation remaining after the reduction of stated capital shall be sufficient to pay any debts of the corporation, the payment of which shall not have been otherwise provided for.

The Fund cited this statute in support of their argument that debtor must be solvent on the date of payment. However, no one contends that stated capital was reduced to make the installments on the repurchase agreement prior to bankruptcy. Rather, as the Trustees argue, the legislature used the term "purchase" in § 351.390 and the phrase "distribution of assets" in § 351.195.6, which have distinctly different meanings. Because the legislature clearly indicated an installment test was to be applied in § 351.195 but chose to use the term "purchase" in § 351.390, the use of the term "purchase" strongly indicates that an outset test is to be applied in § 351.390. Moreover, at least one court has held that a purchase "is the voluntary transmission of property from one person to another in exchange for a valuable consideration. [citations omitted]. No statute is known to use the term 'purchase' to mean the act by which the buyer finally parts with tangible property and not to mean a consummated trade which may be the unconditional exchange of a promissory note for stock." *Williams v. Nevelow*, 513 S.W.2d 535, 537 (Tex.1974). Another court stated that the deletion of the term "payment" from a stock repurchase statute along with the addition of other sections did not clarify but changed the meaning of the statute. *Matter of Poole, McGonigle & Dick, Inc.*, 796 F.2d 318, 323[5] (9th Cir.1986), *as amended by* 804 F.2d 576 (9th Cir.1986). Thus the legislature indicated it no longer intended for both an installment and an outset test to be applied. *Id.* Finally, as noted above, other legislatures have either added or deleted the term "payment" from their statutes to clarify whether an outset or installment test is to be used. *See supra*, n. 5.

Fifth, in many instances the cases comprising the majority view can be distinguished from the present case. For example, in many cases the state statutes contain language that more strongly infers application of an installment test. *See e.g., McConnell v. Estate of Butler*, 402 F.2d 362, 366[6] (9th Cir.1968) (California law requiring solvency at the time of payment); *Mountain State Steel Foundries, Inc. v. Commissioner*, 284 F.2d 737 (4th Cir.1960) (West Virginia law provided that funds could not be *used* if corporation was insolvent); *Matter of Flying Mailmen Service, Inc.*, 539 F.2d 866, 869[1] (2nd Cir.1976) (New York law allowing redemption of shares out of surplus *except when currently* insolvent). Other decisions are a result of the development of the law in this area and should be viewed as such. *Compare In re Fechheimer Fishel Co.*, 212 F. 357 (2nd Cir.1914) (applying the "no prejudice to creditors" rule) *and Robinson v. Wangemann*, 75 F.2d 756, 757[2] (5th Cir.1935) (an attempt to restrict the "no prejudice to creditors" rule). *See generally* Herwitz, *Installment Repurchase of Stock: Surplus Limitations*, 79 Harvard L.J. 303, 308–09 (1965). Some decisions followed the majority view without really comparing the language of the relevant state's statute to that in the opinion it followed. *See e.g., Boggs v. Fleming*, 66 F.2d 859 (4th Cir. 1933); *Matter of Trimble Co.*, 339 F.2d 838, 842–43[1] (3d Cir.1964). In view of these distinctions, this Court determines it should follow Missouri law rather than the majority position.

Finally, application of an outset test appears to be the legislative trend in corporate law. As one authority stated:

In the case of a corporation's agreement to repurchase its shares, the older cases required legally available funds both at the time the agreement was made and at the time of performance. The modern trend is to uphold such agreements as valid, regardless of the situation at the time of the making of the agreement, and to enforce them, even by specific

performance, to the extent that the corporation has legally available funds at the time of repurchase.

Henn & Alexander, *Laws of Corporations*, § 336, p. 939, n. 1 (3d Ed.1983). *Accord*, P. Blumberg, *The Law of Corporate Groups*, § 5.02, p. 208–09 (1980). The Model Business Corporation Act provides that the effectiveness of a stock repurchase agreement is measured at the earlier of the date the debt is incurred or the date the shareholder ceases to be a shareholder. § 6.40(e)(1). If the agreement is effective under § 6.40, then the indebtedness to a shareholder "is at a parity with the corporation's indebtedness to its general unsecured creditors except to the extent subordinated by agreement." § 6.40(f). At least five states have adopted this provision. *Law of Corporate Groups*, § 5.12.1. Similarly, the Delaware stock repurchase statute, 8 Del.Code § 160(a)(1) (1983 Repl. Vol.), provides:

> Nothing in this subsection shall invalidate or otherwise affect a[n] ... obligation of a corporation given by it as consideration for its acquisition by purchases, redemption or exchange of its shares of stock if at the time such ... obligation was delivered by the corporation its capital was not then impaired or did not thereby become impaired.

The trend exhibited in the Delaware statute and the Model Business Corporation Act, confusion among courts in the past, absence of legislative action to overrule *Hawkins*, a reading of §§ 351.390 and 351.-395 together, and the fact that *Hawkins* was a minority opinion issued in the face of an overwhelming majority further persuades this Court that the correct view under the Missouri statute is that implied in *Hawkins:* that a stock repurchase agreement is judged at the time the transaction was closed and the shares were given to the corporation. Here, no one contends there was insufficient surplus on hand at the time the repurchase option was exercised and the indebtedness was incurred. The Trustees assert and the Court

finds that on April 19, 1971, the date the repurchase option was exercised and the indebtedness was incurred, there was surplus capital of $1,628,530. That amount was more than sufficient to pay the entire purchase price of $735,132.95. Additionally, the Court finds that enough surplus existed until March 31, 1981, to pay the entire indebtedness. Accordingly, the Court holds the repurchase agreement is valid under Missouri law and the Trustees' claim will be allowed.

## EQUITABLE SUBORDINATION

Because the repurchase agreement is valid, the next question is whether the Trustees' claim under the agreement should be subordinated to all other creditors as proposed by the Second Amended Plan of Reorganization. The Court first notes that a bankruptcy court exercises a broad range of equitable powers in deciding whether to subordinate claims. *Pepper v. Litton*, 308 U.S. 295, 303–11, 60 S.Ct. 238, 243–47, 84 L.Ed. 281 (1939). Exercise of those powers is within the sound discretion of the court and will not be overturned on appeal absent an abuse of that discretion. *Matter of Poole*, 796 F.2d at 321; *In re Bellucci*, 29 B.R. 814, 815[2] (9th Cir.BAP 1983).

■ In support of the plan, the Fund contends the Trustees' claim falls directly within the mandatory subordination provision of 11 U.S.C. § 510(b) which, at the time this case was filed, provided: [6]

> Any claim for rescission of a purchase or sale of a security of the debtor or of an affiliate shall be subordinated for purposes of distribution to all claims and interests that are senior or equal to the claim or interest represented by such security.

The Fund argues that because the Trustees' claims are based on purchase of debtors' common stock, the claims fall within this mandatory provision and the court must subordinate them. The Court agrees

---

**6.** Section 510(b) was amended by the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353. However, the amendment was given only prospective effect and this case was filed prior to the effective date of amendment.

that the provision, if applicable, is mandatory. However, every case the Court has found applying this provision involved shareholder claims for rescission or damages based on fraudulent sale of securities. *See e.g., In re Stevenson Assoc., Inc.,* 777 F.2d 415 (8th Cir.1985); *In re Flight Transp. Corp. Securities Litigation,* 730 F.2d 1128 (8th Cir.1984), *cert. denied, Reavis & McGrath v. Antinore,* 469 U.S. 1207, 105 S.Ct. 1169, 84 L.Ed.2d 320 (1985); *In re Christian Life Center,* 821 F.2d 1370 (9th Cir.1987); *In re THC Financial Corp.,* 679 F.2d 784 (9th Cir.1982); *In re U.S. Financial Inc.,* 648 F.2d 515 (9th Cir.1980), *cert. denied, Kelce v. U.S. Financial, Inc.,* 451 U.S. 970, 101 S.Ct. 2046, 68 L.Ed.2d 348 (1981); *In re Amarex, Inc.,* 78 B.R. 605 (W.D.Okla.1987); *In re Wisconsin Barge Line, Inc.,* 76 B.R. 142 (Bankr.E.D.Mo. 1987); *In re Stewart Energy Systems of Idaho, Inc,* 61 B.R. 698 (D.Idaho 1986). *See also 3 Collier on Bankruptcy,* ¶ 510.04, p. 510–7 (15th Ed.1988). Additionally, under the statute the shareholder or former shareholder must be attempting to rescind or must have rescinded a stock purchase or sale. Here, as the Trustees point out, they are attempting to enforce the sale of the stock to debtor. Finally, the purpose of § 510(b) is to place the risk of an unlawful issuance of securities on security holders as opposed to general creditors. 3 *Collier on Bankruptcy,* ¶ 510.04, p. 510–7. No one contends the shares of its stock purchased by debtor were illegally issued. Therefore, the facts of this case simply do not fit within the purpose or meaning of § 510(b). For these reasons, the court finds § 510(b) does not apply in this case and the Trustees' claim will not be subordinated under that section.

■ In further support of the plan the Fund contends the Trustees' claim must be subordinated under § 510(c), which allows subordination of an allowed claim using principles of equitable subordination. As the Trustees point out, the doctrine of equitable subordination as codified in § 510(c) "may be applied only if, among other requirements, the claimant has engaged in fraudulent or inequitable activity." *Wegner v. Grunewaldt,* 821 F.2d 1317, 1323[5]

(8th Cir.1987). When there is no evidence of fraudulent or inequitable conduct a claim for equitable subordination cannot stand. 821 F.2d at 1323[6], *citing In re Mobile Steel Co.,* 563 F.2d 692, 704–06 (5th Cir.1977).

In support of its contention the Fund argues that claims arising from the sale of debtor's stock to the debtor must be subordinated when the debtor becomes insolvent even if, when the debt was incurred by sale of the shares, capital was not impaired. *See e.g., Robinson v. Wangemann,* 75 F.2d 756, 757[2] (5th Cir.1935); *In re Fechheimer Fishel Co.,* 212 F. 357 (2nd Cir.1914). The Court recognizes that many courts subordinate claims based on stock repurchases when the transaction is invalid under state law. *See e.g., Reiner v. Washington Plate Glass Co., Inc.,* 711 F.2d 414 (D.C.Cir.1983); *Matter of Flying Mailmen Service, Inc.,* 539 F.2d 866, 869[1] (2nd Cir.1976); *McConnell v. Estate of Butler,* 402 F.2d 362, 366[6] (9th Cir.1968); *Matter of Trimble Co.,* 339 F.2d 838, 842–43[1] (3d Cir.1964); *Boggs v. Fleming,* 66 F.2d 859 (4th Cir.1933). However, if the transaction on which the claim is based is not invalid under state law, and no fraud is involved, the claim should not be subordinated pursuant to § 510(c). *Matter of Poole, McGonigle & Dick, Inc.,* 796 F.2d 318, 324 (9th Cir.1986).

Here, the Court has decided that the stock repurchase transaction was not invalid under state law. Turning to the question of fraud, the Fund has not submitted any evidence suggesting fraud or inequitable conduct. Nor has it suggested what facts give rise to even the slightest inference of fraud or inequitable conduct. Based on the facts alleged by the Trustees and uncontested by the Fund, the Court finds the repurchase agreement was entered into in 1965, almost 20 years before Stern–Slegman's insolvency. The option to purchase the shares under the agreement was exercised and the indebtedness was incurred in 1971, more than a decade before Stern–Slegman experienced the severe financial problems that ultimately led to bankruptcy. Further, the Court finds the

reasons for debtor's ultimate financial demise had nothing to do with repurchase of the stock by the company. Instead, as explained in debtors' Disclosure Statement, debtors' financial problems were due to the following:

In 1980, the Debtor closed its Kansas City manufacturing facility due to its high overhead and labor costs. In the Spring of 1981, the sales force, which at one point in time served approximately forty-two (42) states, was disbanded and since that time the Debtor has focused exclusively then on the contract manufacturing of garments for other manufacturers.

Because of the high interest rates occurring in the early 1980's, the Debtor's need for working capital to finance its accounts receivable, the high union costs which impacted on the nature of the competitive bids that the Debtor could provide and the intense competition coming from overseas, the Debtor was met with a significant liquidity problem. Because of the liquidity problem, the Debtor was required to close certain facilities and faced the prospect of a gradual liquidation. Because of the severe cash flow problems, the Debtor filed petitions initiating these cases on March 14, 1984.

Nowhere is there any indication the repurchase agreement, Stern–Slegman's exercise of the repurchase option or the fact that it incurred an indebtedness to Mr. Stern's estate was in any way fraudulent or had any affect on the financial condition of the company that was inequitable or caused its financial problems. There is simply no evidence of fraud to support subordination of the Trustees' claim under § 510(c). Accordingly, Trustees' claim will not be subordinated to the claims of other general unsecured creditors pursuant to § 510(c). Because the claim cannot be subordinated, the plan in its present form cannot be confirmed.

For the foregoing reasons it is

ORDERED that the objection of the Trustees to subordination of their Class 4 claims is SUSTAINED. The Second Amended Consolidated Plan of Reorganization is hereby DENIED confirmation because it unfairly discriminates against, and does not fairly and equitably treat, Class 4 claimants by subordinating payment of their claims to the payment of all claims in Class 3, contrary to 11 U.S.C. § 1129(b). It is further

ORDERED that Debtors, within 15 days, file a third amended plan or a motion to convert to Chapter 7.