**In re: BETACOM OF PHOENIX, INC., Debtor.**

**American Broadcasting Systems, Inc., a Delaware Corporation; Beta Communications, Inc., an Arizona Corporation; Betacom of Phoenix, Inc., an Arizona Corporation, Plaintiffs–Appellants,**

v.

**F. Patrick Nugent; Anita Nugent, Defendants–Appellees.**

**In re: Betacom of Phoenix, Inc. Debtor.**

**American Broadcasting Systems, Inc., a Delaware Corporation; Beta Communications, Inc., an Arizona Corporation; Betacom of Phoenix, Inc., an Arizona Corporation, Plaintiffs–Appellees,**

v.

**F. Patrick Nugent; Anita Nugent, Defendants–Appellants.**

In re: Betacom of Phoenix, Inc., dba KVVA–AM; In re: Betacom Communications, Inc., dba KVVA–FM; In re: American Broadcasting Systems, Inc., Debtors.

Betacom of Phoenix, Inc., dba KVVA–AM; Betacom Communications, Inc., dba KVVA–FM; American Broadcasting Systems, Inc., Appellants,

v.

Scott Burton; Edward Knight, movants, Appellees.

In re: Betacom Communications, Inc., dba KVVA–FM; In re: Betacom of Phoenix, Inc., dba KVVA–AM; In re: American Broadcasting Systems, Inc. Debtors.

Edward Knight, movant; Scott Burton, movant, Appellants–Appellees– Cross–Appellants,

v.

Betacom of Phoenix, Inc., dba KVVA–AM; Betacom Communications, Inc., dba KVVA–FM; American Broadcasting Systems, Inc., Appellees–Appellants–Cross–Appellees.

Nos. 98–17133, 98–17289, 98– 17142 and 98–17282.

United States Court of Appeals, Ninth Circuit.

Jan. 24, 2001.

Argued and Submitted Dec. 12, 2000.

James E. Cross, Dillingham Cross, P.L.C., Phoenix, Arizona, for the appellants.

Michael E. Gottfried, Jaburg & Wilk, P.C., Phoenix, Arizona, for appellees; Scott Burton, Scottsdale, Arizona, and Edward J. Knight, Chandler, Arizona, for the appellees/cross-appellants.

Before: SCHROEDER, Chief Judge, HALL and WILLIAM A. FLETCHER, Circuit Judges.

CYNTHIA HOLCOMB HALL, Circuit Judge:

Appellants Patrick and Anita Nugent ("the Nugents"), claimants in the bankruptcy proceedings of Betacom of Phoenix, Inc., Beta Communications, Inc. (collectively, the "Betacom Entities"), and American Broadcasting Systems, Inc. ("ABS"), seek parity with the general unsecured creditors of the Betacom Entities and ABS. The bankruptcy court granted partial summary judgment to the Betacom Entities and ABS (collectively, the "Debtors") and subordinated the Nugents' breach of contract claim under 11 U.S.C. § 510(b). The district court reversed the decision of the bankruptcy court to subordinate the claim. The district court held that an actual purchase or sale of securities is necessary to trigger mandatory subordination under § 510(b) and that there was an issue of material fact as to whether there had been an actual purchase or sale of securities.

The Debtors appeal the decision of the district court. 28 U.S.C. § 158(d) gives this Court jurisdiction over final orders of the district court rendered in its bankruptcy appellate capacity. *See In re Adams Apple, Inc.*, 829 F.2d 1484, 1487 (9th Cir. 1987) (holding that a district court order subordinating the claims of some creditors is final).

■ The Nugents cross-appeal the bankruptcy court's grant of partial summary judgment. The decision of the bankruptcy court is a final order as to the claims that were subordinated. *See Christian Life Ctr. Litig. Defense Comm. v. Silva (In re Christian Life Ctr.)*, 821 F.2d 1370, 1373 (9th Cir.1987). Under 28 U.S.C. § 158(d) and 28 U.S.C. § 1291, this

Court has jurisdiction over the final orders of a bankruptcy court.

## I. FACTS AND PROCEDURAL HISTORY

The Nugents were shareholders in Betacom, Inc. Betacom owned all of the outstanding stock of debtor Betacom of Phoenix, Inc., and 80 percent of the outstanding stock of debtor Beta Communications, Inc. The Betacom Entities owned two radio stations.

In 1991, Betacom entered into a Merger Agreement with debtor ABS. The parties entered into a superseding amendment dated February 6, 1992. The Merger Agreement, as amended, provided that ABS was to acquire Betacom in exchange for ABS stock. ABS was to assume certain Betacom liabilities and agreed to use its best efforts to use the proceeds of a future registration or offering to retire the Betacom debts, including debts owed to the Nugents. The Merger Agreement called for an audit to determine the value of the liabilities assumed by ABS. For 45 days after the completion of the audit, the ABS shares would be held in escrow, after which they would be delivered to the Betacom shareholders. The audit was never performed, and ABS never paid the Nugents any cash or stock. In July 1992, the Nugents filed suit in federal district court against ABS and the Betacom Entities for breach of the Merger Agreement and breach of an alleged oral consultancy agreement between the Nugents and ABS (the "District Court Litigation"). In their Fourth Amended Complaint, filed on July 1, 1996, the Nugents asked for damages in lieu of the promised ABS stock. In their original and first three amended complaints, the Nugents had asked for declaratory relief in the form of a determination of the number of ABS shares to which they were entitled under the Merger Agreement as well as damages for unpaid consulting fees.

In May 1995, the Debtors filed Chapter 11 bankruptcy petitions (Nos. B95–04510,

B95–01511, and B95–04599). The three bankruptcy cases are being jointly administered. On January 10, 1996, the Nugents filed three proofs of claim in the bankruptcy case. The first was an unsecured claim for $168,365 allegedly owed by Betacom pursuant to a promissory note dated May 1, 1989 in the principal amount of $68,000. The second was a secured claim for $693,785 pursuant to a promissory note from Betacom also dated May 1, 1989 in the principal amount of $159,000. The Nugents' third proof of claim alleges an unsecured, non-priority claim against ABS in the amount of $4,190,428 for ABS's alleged breach of contract and fraud, which was being litigated in the District Court Litigation. The Nugents obtained an order modifying the automatic stay to allow the District Court Litigation to proceed to final liquidation.

■ The Debtors filed a complaint in the bankruptcy court against the Nugents and two other Betacom shareholders, Scott Burton and Ed Knight, seeking mandatory subordination of their claims ("the Subordination Litigation"). Section 510(b) of the Bankruptcy Code mandates the subordination of damages claims "arising from the purchase or sale of a security."[1] On September 30, 1997, the bankruptcy court entered the order at issue in the Nugents' cross-appeal and granted partial summary judgment in favor of the Debtors on the issue of whether the Nugents' claims were subordinated. A similar order was issued against Burton and Knight on April 24, 1998. The bankruptcy court reasoned that the language of the statute is "plain" and that the merger of Betacom into ABS was a "purchase or sale of securities of the Debtor." It added that a literal reading of

the statute was not at odds with the statute's legislative history, which expressed a concern with adapting bankruptcy distribution to the differing expectations of shareholders and general creditors. The bankruptcy court found, however, that there was a material issue of fact whether some of the Nugents' other claims (e.g., a claim for back wages on the alleged consultation agreement with ABS) were related to the purchase or sale of securities. On these claims, the bankruptcy court denied summary judgment.

On September 24, 1998, the district court, acting in its capacity as a bankruptcy appellate court, reversed the decision of the bankruptcy court to subordinate the Nugents' breach of contract claims. *In re Betacom of Phoenix, Inc.*, 225 B.R. 703 (D.Ariz.1998) (the "1998 Van Sickle Order"). The district court held that: 1) an actual purchase or sale of stock is required to trigger mandatory subordination under § 510(b); and 2) when the evidence was construed in the light most favorable to the Nugents, the Debtors had not met their burden of proof in showing that there was no material issue of fact as to whether the merger had closed. In a separate appeal, a different district court judge found the 1998 Van Sickle Order to be controlling and vacated the bankruptcy court's order granting summary judgment for the Debtors against Knight and Burton. The Debtors appeal the 1998 Van Sickle Order as well as the order reversing summary judgment against Knight and Burton. The Nugents and Knight cross-appeal the bankruptcy court decision.[2]

■ This Court reviews the district court's decision on an appeal from a bank-

---

1. For the purpose of a distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if

such security is common stock, such claim has the same priority as common stock.

11 U.S.C. § 510(b).

2. Burton was originally part of the cross-appeal against the Debtors, but has since stipulated to the dismissal of his part of the cross-appeal.

ruptcy court de novo. *See Preblich v. Battley*, 181 F.3d 1048, 1051 (9th Cir.1999). The bankruptcy court's grant of summary judgment is also reviewed de novo. *See In re Bakersfield Westar Ambulance Inc.*, 123 F.3d 1243, 1245 (9th Cir.1997). The bankruptcy court's findings of fact are reviewed for clear error. *See In re Weisman*, 5 F.3d 417, 419 (9th Cir.1993).

■ Debtors argue that the district court's determination that the bankruptcy court erred in finding that the Merger Agreement had closed is a finding of fact subject only to review for clear error. The Nugents contend that the district court made no finding of fact and accepted no evidence on the issue so its determination should be reviewed de novo. As the district court explained, this was not "a purely factual question." Accordingly, its determination should be reviewed de novo. *See In re Chang*, 163 F.3d 1138, 1140 (9th Cir.1998) (stating that mixed questions of law and fact are reviewed de novo).

## II. ANALYSIS

The Nugents raise three arguments for why their claim should not be subordinated to the claims of the Debtors' unsecured creditors: 1) § 510(b) only applies to securities fraud claims; 2) § 510(b) does not apply to their claim since they never enjoyed the "rights and privileges" of stock ownership; and 3) the Merger Agreement never closed, and, therefore, there was not an actual sale or purchase of securities that could trigger mandatory subordination under § 510(b).

### A. *Mandatory Subordination is Not Limited to Securities Fraud Claims*

The Nugents contend that § 510(b) applies only to securities fraud claims. The Nugents argue that because they have not asserted fraud in the issuance of ABS securities, their claims against ABS should not be subordinated. Two cases support the Nugents' position: *In re Stern–Slegman–Prins Co.*, 86 B.R. 994 (Bankr.

W.D.Mo.1988), and *In re Amarex, Inc.*, 78 B.R. 605 (W.D.Okla.1987). In *Amarex*, limited partners sought damages stemming from a general partner's mismanagement. The limited partners filed claims for breach of contract and common law fraud. The court concluded that the limited partners' claims should not be subordinated. *See id.* at 609–10 ("Section 510(b) pertains only to claims based upon the alleged wrongful issuance and sale of the security and does not encompass claims based upon conduct by the issuer of the security which occurred after this event."). In the *Stern–Slegman* case, a shareholder sued to enforce a stock repurchase agreement. The court held that the shareholder claims should not be subordinated. It noted that "every case the Court has found applying [510(b)] involved shareholder claims for rescission or damages based on fraudulent sale of securities." *Stern–Slegman*, 86 B.R. at 1000.

Recently, however, more courts have interpreted § 510(b), and have decided that the statute requires subordination of more than securities fraud claims. *See In re NAL Financial Group, Inc.*, 237 B.R. 225, 234 (Bankr.S.D.Fla.1999); *In re Granite Partners*, 208 B.R. 332, 337 (Bankr. S.D.N.Y.1997) (cautioning against an overly restrictive interpretation of § 510(b) because Congress was concerned with all investor claims against a stock issuer for loss of investment, not just fraudulent issuance claims); *In re Public Service Co. of New Hampshire*, 129 B.R. 3, 5 (Bankr. D.N.H.1991) ("Although the claim in this case is largely based on fraud, the language of 510(b) is broad enough to include breach of contract and related actions as well."); *In re Lenco, Inc.*, 116 B.R. 141, 144 (Bankr.E.D.Mo.1990) (applying § 510(b) in a case that involved no allegations of fraud). In *NAL Financial Group*, the breach of contract claim at issue arose from the debtor's failure to register debentures as required under a securities purchase agreement. The court explained that the claim would not exist unless the parties had entered into the agreement,

which was for the "purchase or sale of a security of the debtor" under § 510(b). Therefore, the statute required that the claim be subordinated. *See NAL Financial Group,* 237 B.R. at 234.

 The recent interpretations of the statute are more persuasive than the two cases cited by the Nugents. Section 510(b)'s legislative history does not reveal an intent to tie mandatory subordination exclusively to securities fraud claims. Congress relied heavily on the analysis of two law professors in crafting the statute. *See* H. Rep. 95–595, at 195 (1977), U.S.Code Cong. & Admin.News 1978, 5787, 6155 (explaining that the argument for mandatory subordination is best described by Slain & Kripke, *The Interface Between Securities Regulation and Bankruptcy–Allocating Risk of Illegal Securities Issuance Between Securityholders and the Issuer's Creditors,* 48 N.Y.U. L.Rev. 261 (1973)); *see also Granite Partners,* 208 B.R. at 336 ("Any discussion of section 510(b) must begin with the 1973 law review article authored by Professors John J. Slain and Homer Kripke."). According to Slain and Kripke, the dissimilar expectations of investors and creditors should be taken into account in setting a standard for mandatory subordination. Shareholders expect to take more risk than creditors in return for the right to participate in firm profits. The creditor only expects repayment of a fixed debt. It is unfair to shift all of the risk to the creditor class since the creditors extend credit in reliance on the cushion of investment provided by the shareholders. *See Granite Partners,* 208 B.R. at 336–37. There is nothing in the Slain and Kripke analysis to suggest that Congress's concern with creditor expectations and equitable risk allocation was limited to cases of debtor fraud.

The Nugents alleged that ABS breached the Merger Agreement in failing to convey shares. In a subsequent complaint, their Fifth Amended Complaint, they alleged that the merger never closed, and that ABS unlawfully converted their interest in Betacom. Regardless, their claims are for damages surrounding the sale or purchase of a security of the debtor. Following the Slain and Kripke risk allocation analysis endorsed by Congress, the bankruptcy court decided correctly that the Nugents' claims fell under § 510(b) even though the Nugents did not allege violations of the securities laws.

### B. *Physical Possession of the Stock is Not Required Under § 510(b)*

 The Nugents maintain that § 510(b) does not apply to their claims because they never enjoyed the rights and privileges of ownership of ABS stock and that only bonafide shareholder claims come within the ambit of the statute. The Nugents never received any ABS stock or cash for their Betacom shares. For its part, ABS contends that the Nugents enjoyed several benefits under the Merger Agreement including participation in shareholder meetings and the assumption by ABS of Betacom debts personally guaranteed by the Nugents. ABS argues that the Nugents have only themselves to blame for not receiving their stock since they breached the Merger Agreement by refusing to sign a deed of release and thereby forced ABS to keep the shares in escrow.

Nothing in § 510(b)'s text requires a subordinated claimant to be a shareholder. *See In re Walnut Equipment Leasing Co.,* 1999 WL 1271762, *6 (Bankr.E.D.Pa.1999) ("[T]he language of § 510(b) does not limit its application to any particular type of claimant but, rather, focuses on the type of claim possessed."); *see also In re THC Financial Corp.,* 679 F.2d 784, 787 (9th Cir.1982) (interpreting the Bankruptcy Act to subordinate a claim for shares of escrowed stock that had not been delivered under the terms of a merger agreement). The Nugents argue that application of § 510(b) to non-shareholders would pervert the statute's purpose. They maintain that unless stock ownership is required for mandatory subordination, a corporation

could sell stock to an investor for valuable consideration, keep the consideration without delivering the stock, declare bankruptcy the next day, and pay off creditors without paying off the investor.

Here, however, the Nugents waited years to assert their claim for damages for breach of the Merger Agreement and refused to accept tender of the ABS shares when offered. Meanwhile, creditors relied on the Betacom Entities' assets transferred by the Nugents in their decisions to extend credit to ABS. The Slain and Kripke risk analysis embodied in § 510(b) makes just as much sense in the Nugents' situation as it does in the situation of a claimant who physically received her stock certificates, but was defrauded into purchasing them. The Nugents were experienced businesspeople who traded their equity in Betacom for a chance at greater earnings with ABS after its initial public offering. Even though the Nugents never received their stock, it remains true that they decided to enter the Merger Agreement with the understanding that they faced the risk that ABS's IPO could fail and that ABS might go bankrupt.

## C. *An Actual Sale is Not Required to Subordinate the Nugents' Claim*

The Nugents contend that an actual sale or purchase of a security is required for mandatory subordination. If the Merger Agreement never closed, they argue, there was no sale and their claims should not be subordinated. The district court agreed with this argument. It reasoned that in the absence of the equity supplied by a shareholder's investment, creditors could not claim to have relied on that equity in deciding to extend credit. The district court reversed the bankruptcy court's grant of summary judgment requiring subordination of the Nugents' claims. The district court explained that it was unclear whether ABS had breached the Merger Agreement, and, therefore, it was improper to find at summary judgment that no

purchase or sale of securities ever took place.

In determining whether or not an actual sale or purchase is required for mandatory subordination, we must examine the reasoning behind § 510(b). There are two main rationales for mandatory subordination: 1) the dissimilar risk and return expectations of shareholders and creditors; and 2) the reliance of creditors on the equity cushion provided by shareholder investment.

The first rationale applies even if there is no "actual" sale or purchase. Before they receive any stock or extend a line of credit, investors and creditors have different expectations. Even if an investor never receives her promised shares, she entered into the investment with greater financial expectations than the creditor. The creditor can only recoup her investment; the investor expects to participate in firm profits. *See Granite Partners,* 208 B.R. at 336. The House Report on § 510 follows this logic:

> Placing rescinding shareholders on a parity with general creditors shifts the risk of an illegal stock offering to general creditors. The general creditors have not had the potential benefit of the proceeds of the enterprise deriving from ownership of the securities and it is inequitable to permit shareholders that have had this potential benefit to shift the loss to general creditors.

H. Rep. 95–595 at 195, U.S.Code Cong. & Admin.News 1978, at 6156.

The second rationale for not allowing shareholder claimants to take priority over creditor claimants is that creditors may rely on the funds contributed by the shareholders in assessing the risk of their loan to the debtor. The legislative history of § 510 specifically notes this argument in the Slain and Kripke article: "[Slain and Kripke] point out that in the instant case, the unsecured creditor does rely on an apparent cushion of equity securities in making the decision to extend credit." *Id.;*

*see* Slain & Kripke, *supra,* at 288 ("a distinction [should] be drawn between general creditors who have relied upon the stockholder's undertaking and those who have not"). According to the district court, even if there is a claim stemming from an agreement to purchase or sell stock, if the stock is never issued to an investor, then future creditors do not rely on the investor's contribution in making their decisions to extend credit and the creditors do not deserve to move ahead of the investors in the bankruptcy line.

■ The district court's reasoning makes sense, but it does not fit the facts of this case. Some of the Debtors' creditors extended credit *after* ABS merged with Betacom. Presumably, ABS's creditors noted that ABS now had two new radio stations as assets before deciding to extend credit. According to Slain and Kripke, it is unfair for shareholders to have the same priority in bankruptcy proceedings as these creditors.[3] Without § 510(b), shareholders with a valid claim for damages have the same rights as creditors to recover their investment in the bankrupt firm, the same investment that the creditors relied on when extending credit. The district court's interpretation of § 510(b) to require an actual stock purchase might be valid in some situations, but not in a situation like the one faced by the ABS creditors who relied on the Nugents' con-

tribution when they decided to extend credit.[4]

Burton and Knight admit that their situation is "identical" to that of the Nugents. In his order reversing the bankruptcy court's summary judgment decision against Burton and Knight, the district judge explained that Burton and Knight's appeal was controlled by the 1998 Van Sickle Order. Since that order was based on the need for an actual purchase or sale and we hold that an actual purchase or sale is not required for mandatory subordination, the district court's order is reversed and Burton and Knight's claims are subordinated along with the Nugents' claim. Debtors' argument that the district court failed to engage in an "independent analysis" of the Burton and Knight appeal does not need to be addressed.

## D. *Promissory Notes Claims*

In addition to their claim for damages based on breach of the Merger Agreement, the Nugents also filed claims based on promissory notes from Betacom. Without comment, the bankruptcy court appears to have subordinated the two promissory note claims along with the breach of contract claim. The 1998 Van Sickle Order reversing the bankruptcy court fails to mention the two claims. The Nugents contend that even if this Court concludes that their breach of contract claim should be subordinated, the promissory note

---

**3.** We propose that each creditor of a distressed enterprise be presumed to have relied upon each prior investment in equity and junior debt. The corollary is that the rescinding investor should be barred from competition with any subsequent creditor unless, and to the extent that, the investor can prove nonreliance by the investor.
Slain & Kripke, *supra,* at 294.

**4.** On May 21, 1999, in the District Court Litigation, the district court granted partial summary judgment for the Debtors and dismissed the Nugents' constructive trust, fraud, and conversion claims. The district court found that the Nugents' constructive trust claim, which was based on a claim that the merger of Betacom and ABS never closed,

was barred by judicial estoppel because the bankruptcy court, the Bankruptcy Appellate Panel, and the district court, acting as an appellate court to the bankruptcy court, had all relied on the Nugents' repeated assertions that the merger had closed. Judicial estoppel "precludes a party from gaining advantage by taking one position, and then seeking a second advantage by taking an incompatible position." *Rissetto v. Plumbers and Steamfitters Local 343,* 94 F.3d 597, 600 (9th Cir.1996). We need not decide whether the district court's application of judicial estoppel was appropriate, since we have already concluded that the Nugents' claims should be subordinated even if the Merger Agreement never actually closed.

claims should not be subordinated because they do not arise from the sale or purchase of ABS stock. Since neither the bankruptcy court nor the district court have addressed the note claims and there is little evidence in the record to explain their origin, we remand these two claims to the bankruptcy court. If the promissory note claims are linked to the Merger Agreement, they should be subordinated along with the breach of contract claim.

## CONCLUSION

The bankruptcy court properly subordinated the claims of the Nugents and Knight and Burton for breach of contract against the Debtors. The bankruptcy court orders granting partial summary judgment against the Nugents and summary judgment against Knight and Burton are AFFIRMED. The district court orders reversing the bankruptcy court's orders granting summary judgment are REVERSED. The Nugents' claims for damages relating to the two promissory notes are remanded to the bankruptcy court.